[Crim. No. 3945. Third Dist. Nov. 29, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. WALLACE ROBERTS, Defendant and Appellant.

Frank Duncan for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and Daniel Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

PIERCE, P. J.—The appeal is from a conviction of first degree murder.

The contentions ably presented will be discussed under captions below. One question is whether a visit to and search of defendant's apartment was made with defendant's knowledgeable consent. Credible, substantial testimony by the police officers involved would have justified the jury in finding that it was. Before incriminating evidence was discovered as a result of the search defendant was questioned. These questions and the answers thereto were properly admitted at the trial. At that time defendant was a suspect but not one upon whom suspicion had focused as a prime suspect. (See *People* v. *Dorado*, 62 Cal.2d 338, 347 [42 Cal.Rptr. 169, 398 P.2d 361].) He was not under arrest. ▮▮▮ As soon as incriminating evidence (money undoubtedly stolen from the victim) was found, defendant was advised of his "constitutional rights"; his right to remain silent and his right to an attorney. He was not expressly informed that any statement made could be used against him, nor was he advised of his right, if indigent, to have an assigned attorney whom he could have present during the interrogation. Thus the warning given was sufficient under *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], as interpreted in *People* v. *Dorado, supra,* but it was insufficient under *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed. 2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The *Miranda* rule, as a federal mandate, applies only to cases tried after its date, June 13, 1966. (*Johnson* v. *New Jersey,* 384 U.S. 719, 733 [16 L.Ed.2d 882, 892, 86 S.Ct. 1772, 1781].) This case was tried before that date. The California Supreme Court, however, has not determined whether the more exacting warning required under *Miranda* shall be made retroactive. This it may do under language in the *Johnson* decision.[1] But under the facts of this case we need not determine whether admission into evidence of defendant's extrajudicial statements was error. Defendant did not confess. His statements intended to be exculpatory were inculpatory. Error, if any, was nonprejudicial. His guilt

---

[1]The language in *Johnson* is as follows: "Of course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision." (384 U.S. at p. 733 [16 L.Ed.2d 882, 892, 86 S.Ct. 1772, 1781].)

proved by legally admitted evidence is beyond rational question. There has been no miscarriage of justice. We find no other error. We will affirm the judgment.

At 11:25 p.m. on the night of February 3, 1965, a state janitor, T. J. Anderson, was discovered lying unconscious in a small photographic darkroom in the corner of a larger reproduction room (Room 50) in the basement of the State Public Works Building in Sacramento. He was discovered by his foreman, George Smith. Anderson lay in a pool of blood. A hammer was imbedded in his head. He died from the wounds five days later.

Immediately following the discovery of the victim, police officers were called and an investigation began. The following facts were learned: a brown leather wallet containing cards bearing the victim's name—but with no money in the wallet—was found in the darkroom. Anderson had a reputation among his coworkers, including defendant, for carrying comparatively large sums of money.

Defendant was also a janitor employed in the Public Works Building and was at work that night. It was proved at the trial that Anderson had had six $20 bills, two $5 bills and a few $1 bills on his person immediately before going to work that afternoon. Evidence of this was unassailable and is undisputed. Through information obtained of the habitual steps Anderson took in the performance of his janitorial duties, the officers were able inferably to place the time of the attack on Anderson at a time shortly after 9 p.m. These circumstances were: the victim usually took a lunch break between 8:30 and 9 p.m., commencing his janitorial duties in Room 50 thereafter. Only a very little of the post-9 p.m. work had been accomplished. Shortly after 9 p.m. janitor William Dungan borrowed some cleaning equipment from Anderson's cleaning cart which was customarily left outside the room he was cleaning and which that night Dungan found outside Room 50. When he returned the borrowed cleaning equipment at approximately 9:30 p.m., he looked inside Room 50 but did not see Anderson there. He did not look inside the darkroom, the door to which was closed. Defendant produced as a witness janitor Meyer who testified to a conversation with Anderson. He fixed the conversation as being on the night of the assault and the time as being at 10 p.m. The prosecution challenged and materially weakened the credibility of Meyer's testimony. On cross-examination he admitted talking with his foreman, George Smith, about this incident, one or two days after the

assault. During that conversation he acknowledged he may have told Smith "to avoid any argument" that he thought but was not certain he had seen Anderson. On rebuttal Smith testified categorically Meyer had admitted doubt as to the night when he had seen and talked with Anderson. He also admitted being upset over a condition affecting his son.

We turn now to what is known of the movements of the defendant on the night of February 3. His duties were to clean the restrooms of the first, second and third floors of the "new annex" of the Public Works Building. His habit was to eat at the second-floor lunch room between 8:30 and 9 p.m. He was not seen by any of the other janitors there that night, although he testified he had been there with two of them.

At approximately 9:20 p.m. defendant was observed running along the fifth floor hallway of the building by another janitor, Jeffrey Wood. Defendant at that time was clad *in a dark sports shirt and light work trousers.* He appeared very excited. Wood called out to him: "How's it going." Defendant replied: "So so," without breaking stride. Defendant's duties did not call for him to be on the fifth floor and Wood had never seen him there before.

Between 9:30 and 10 p.m. defendant appeared at the door of the first floor "hopper" room where janitor, Thomas Bennett, was cleaning his tools. He told Bennett he had spilled Clorox on his clothes and asked Bennett whether it would take the color out of the clothes. Bennett told him that it would.

At about 9:30 p.m. defendant entered the second floor restroom. Janitor Tyrese Fegan was already there. Defendant told Fegan he had "wasted some Clorox" on himself. His explanation: " 'Terry,' he says, 'I been calling and talking on the phone with a girl and,' he said the girl had him so nervous he had wasted Clorox on himself." Fegan noticed there were spots down both legs of defendant's trousers. At the trial Fegan identified the trousers and black sports shirt theretofore established to be the clothes defendant had been wearing when at work that night. Defendant informed Fegan he had another pair of trousers in the "hopper" room. Fegan suggested to defendant that he change his clothes and rinse out the pair of trousers which were spotted with bleach. Defendant did so, changing into a dark pair of trousers. He also took off his black sports shirt and put on a white T-shirt. Defendant then washed out the trousers he had been wearing and put them on a hanger. He then left the room.

Shortly after Anderson had been removed to the hospital,

the building personnel were assembled by the police in a basement locker room. The clothing of each man was examined: each was asked whether he had changed his clothing that night. When an answer was in the affirmative an inspection was made of the clothing indicated. Defendant was questioned first. He was then wearing the dark trousers into which, according to janitor Fegan, he had changed earlier. He denied that he had changed his trousers; untruthfully stated he had worked in the dark trousers and T-shirt all evening.

Defendant left the building at approximately 1:30 a.m. On leaving the building he picked up and took with him a hanger on which the wet trousers and the shirt he had been wearing earlier were hung.

Thereafter, during the interrogation of the other personnel carried on by the police officers, the latter learned that appellant had, in fact, changed and washed his clothing.

At approximately 4 a.m., Sacramento Police Officers Tipton and Sickles proceeded to defendant's home to speak to him. They knocked and received no response. They remained in the vicinity and kept the house under observation until relieved by Officers Kunz and Relles.

The information the latter officers had at that time, obtained either at the police station or from the officers whom they were relieving, was that a man had been beaten; that his wallet had been found and that it was empty; and that the person whose apartment they were watching was known to have washed out some clothing at the place where the incident had occurred and after it had occurred. Uncertainty exists in the record whether these officers also knew that defendant, when questioned at the state building, had denied the change of clothes. The officers did not have a warrant for the arrest of defendant and did not have a search warrant.

Kunz and Relles waited and watched for approximately an hour and then (at approximately 9 a.m.) knocked at the door of defendant's apartment. Receiving no response, they went to the adjacent apartment of June Wright, the landlady of the apartment house. By telephone the officers informed the police department they had knocked without response and they intended to enter defendant's apartment. Mrs. Wright accompanied them to defendant's apartment with a passkey. Before entry by that means the officers knocked again. This time defendant did respond and opened the door partially. He was clad in a T-shirt and shorts.

The testimony of the officers is that Mrs. Wright was then dismissed, the officers, dressed in plain clothes, showed their identifications, and Officer Relles asked permission of defendant to enter, stating they desired to talk with him. Although they were carrying holstered pistols, these were concealed by their coats from, and at no time revealed to, defendant. Defendant said, "Come in," or words to that effect, opened the door wider, stepped back and the officers entered the living room of the apartment. There they informed defendant they were investigating a beating at the state building and asked defendant's permission to search the apartment. Defendant said, "Go ahead." After the officers had glanced about the living room, they expressed a wish to enter the bedroom. Defendant stated his wife was there in bed. The officers asked whether she was "decent," or words to that effect. Defendant led the way into the room. The officers admitted it had been their intention to enter defendant's apartment, using the pass-key, regardless of defendant's consent.

Defendant testified at the trial, both on *voir dire* and in his own defense. His account of the entry by the officers into the apartment differs from theirs in the following respects: when he had responded to the knocking on the door and the officers had asked whether they might come in, he had asked them to wait "Just a moment. I want to put on some pants." The officers, however, pushed the door wider open and entered, pushing him, but without force, against the wall. One of the officers, he said, exposed his pistol. (This was denied by the officers.) Defendant stated that when the officers had started to go into the bedroom he had said, "Wait, you can't go in there. My wife's in bed." One of the officers then said, "That's all right. She has covers over her." All three then entered.

There is no material conflict regarding what followed. Officer Relles observed a pair of dark gray trousers hanging over a chair. Defendant said he had worn them the previous evening. Meanwhile, Officer Kunz found a black knit sports shirt on a hanger in a passageway to the bathroom. The lower portion was damp and bore the odor of bleach. Officer Relles next found the light gray cotton trousers, also damp. Defendant then stated he had spilled Clorox on them and had washed them.

At this point Officer Kunz advised defendant of his right to remain silent and to have the services of an attorney. To the officer it appeared that defendant understood the admonition.

Officer Relles then noticed a bulge in the fly of the dark

trousers. Asked by Officer Relles what this was, defendant replied, "Money." The officer confirmed the fact that it was money but did not count it. Defendant and his wife were then taken to the police station. There the money was counted. The roll contained six $20 bills, two $5 bills and four $1 bills—the same denominations as the money carried by Anderson on the night of the assault.

The officers had taken the clothing described above with them to the police station; also a pair of soiled white tennis shoes. This clothing was placed in the custody of criminalist David Burd.

Shortly after defendant arrived at the police station a form was presented to him which he signed and which the officers witnessed. The form reads as follows:

"To whom it may concern.

"I have been advised by Officers Relles and Kunz of my right to consult with an attorney and my right to remain silent.

"I have further been advised that any statement regarding the matter under investigation that I have previously made without first having been advised of my right to consult with an attorney and my right to remain silent may not be used against me."

Before defendant signed the statement it was read to him. In defendant's handwriting appears the date and "0945." (The actual time of signing was after 11 a.m.) Added in defendant's handwriting were the words: "I fully understand these rights." Defendant then gave a statement which was admitted into evidence at the trial.

He stated under questioning that on the night of the offense he had gone to work as usual, eating lunch with janitors Fegan and Hicks. He said that at about 9:30 or 9:40 he had accidentally spilled bleach on himself and had consequently changed his clothing. After the discovery of the injured Anderson he had been examined by the officers and excused. He had then gone home, telling his wife what had happened. Hicks had gone home with him, the two had had a beer and defendant had retired for the night.

Asked about the money in his trousers, defendant said it represented wedding gifts. (He and his wife had been married early in January.)

Significant proof at the trial in addition to that mentioned above included the following: On Friday, January 29, defend-

ant was in financial straits. His usual paycheck was $300 but he had received only $40. The balance had been withheld apparently because of some lien or other distraint. On Saturday, January 30, and again the following day, he had phoned Charles Hill, a state employee and a representative of the California State Employee's Association, seeking aid in securing the balance of his check and a loan. Further conversations between Hill and the defendant were held on February 1 and 2. Hill informed defendant no loan would be made but that the release of the balance of his wages was being investigated. It was shown that defendant was substantially in debt. (All of this was proved by the prosecution.)

Criminalist David Burd testified regarding tests performed by him for blood on the various articles of defendant's clothing which had been brought in. Because of the strong bleaching solution which had been applied by defendant, of four spots found on the trousers which were "possibly blood" only one could be positively identified as such. Significant also is the fact that the bleach had been applied on the very portions of the clothing where these spots appeared. The black sports shirt similarly yielded inconclusive indications of blood where bleach had been applied. Several minute spots of human blood were discovered near the neck of the T-shirt; defendant's shorts bore a smear of human blood on the waistband. Human blood spots were found on his tennis shoes. Burd stated the blood on the shoes was either very fresh or the shoes had not been worn since contacting the blood. No bleach had been applied on the three items last mentioned.

Defendant in his testimony explained his denial to the officers at the scene of the assault of the fact he had changed his clothes. He said he was fearful the officers would find the money. His statement as to the source of the money differed from the "wedding present" version given before. He testified that two men and a woman had appeared at his apartment (apparently without appointment) at 2 a.m., Monday, February 1, 1965, and had bought a jar full of hypodermic syringes and needles from him. He said he was a diabetic and his insulin injecting equipment had been in his possession for some years. He could not give the names of any of his night visitors but one of them was known to him by sight. Defendant's excuse for a vagueness regarding the whole incident was that he was intoxicated at the time. The sales price of the syringes and needles had been $117.

Defendant attributed the blood found to the fact that his

wife had cut her finger: that she was a "bleeder" and that apparently her blood had gotten on his clothing while his wife was sorting and folding it.

Defendant's description of the Clorox spilling episode: While holding the plastic bottle in his left hand, he had unscrewed the cap with his right. His left hand was wet and the bottle slipped out of his hands. As a result some of the bleach had spilled down the front of his trousers. Confronted with the fact that the bleach spots were also on the back of the trousers he said he had jumped back and turned around when some of the Clorox had gotten under his eye and on his lip. Following is his testimony regarding the route to the floor of the falling bottle: "Q. . . . It spilled bleach down the front of you, getting some on your shirt and the rest on your pants as it fell? A. *Yes, but when it fell it was setting upright.* Q. When it fell it was like that? A. Something like that. Q. On the edge. A. Yes, but it was almost full. Q. And the bleach, the top was off, of course, when it fell? A. Yes, it was on the floor. Q. And as it hit the ground, some more of the bleach bounced up on you, right? A. Right." (Italics supplied.)

To explain the episode to which janitor Wood had testified —seeing defendant run down the hall of the fifth floor looking very excited—defendant testified he really had not been running but was doing a dance called the "pony." He said he had gone to the fifth floor to talk to janitor Hicks about a phonograph record but Hicks was not there so he started the dance down the hall. He admitted seeing and talking to Wood as described by the latter.

### RE THE CONTENTION THE SEARCH MADE IN DEFENDANT'S APARTMENT WAS ILLEGAL

A search of anyone's home may be made legally only when the search is made either (1) with a search warrant legally issued; or (2) when the search is immediately incidental to an arrest made with a legally issued warrant for arrest; or (3) without either a search or arrest warrant, when the search is immediately incidental to an arrest upon probable cause; or (4) when the search is made with the voluntary and free consent of the person whose premises are to be searched. All of these general rules are so well settled that citation of authority here would be superfluous. We consider the rules just expressed in connection with the facts of this case.

The police did not have a search warrant. Why? There had been plenty of time to obtain a search warrant. The grounds for issuance of a search warrant are expressed in Penal Code

section 1524. Subdivision 4 is applicable. It provides (after the general provision that "A search warrant may be issued upon any of the following grounds") : "4. When the property or things to be seized consist of any item or constitutes any evidence which tends to show a felony has been committed, or tends to show that a particular person has committed a felony."

█ The quantum of evidence necessary for the procurement of a search warrant is not the same as that necessary to justify an arrest on probable cause without a warrant. The United States Supreme Court in *United States* v. *Ventresca,* 380 U.S. 102 [13 L.Ed.2d 684, 85 S.Ct. 741] (decision written by Mr. Justice Goldberg) discusses the differences at length (see pp. 687, 688). The theme : that the design of the Fourth Amendment is not to deny to law enforcement officers "the usual inferences which reasonable men draw from evidence" but to afford the citizen the protection of a source—"a neutral and detached magistrate" to make the determination whether the search is justified rather than to make a police officer, possibly overzealous in quest of quarry, the arbiter of the justification. In the *Ventresca* opinion it is stated : "Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." (The provisions we have quoted above from *Ventresca* were in turn quoted from *Johnson* v. *United States,* 333 U.S. 10, at pp. 13-14 [92 L.Ed. 436, 440, 68 S.Ct. 367, 369].) And the *Ventresca* decision says (at p. 687 of 13 L.Ed.2d) : "[T]his Court, strongly . . . [supports] the preference to be accorded searches under a warrant, . . . [and] in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall."

An article by David R. Manwaring, *California and the Fourth Amendment,* in 16 Stanford Law Review 318, at page 336, criticizes our California courts and states that in the area of search incident to arrest the solicitude of our courts for the police has had the result "virtually to abolish the search warrant in felony cases."

We have detoured in our discussion to be critical of the failure of the police to obtain a warrant before searching defendant's home under the facts of this case. As stated, they had had ample time to do so. Although at the time of the

search it is arguable this may have been one of those marginal cases referred to in *Ventresca,* we do not doubt that a magistrate would have issued a search warrant on the evidence then available, to wit: (1) a bloody assault, (2) the empty wallet of the victim lying near him, (3) the suspicion aroused by the fact that defendant had changed his clothes, and (4) the "coincidence" of the spilling of Clorox. Neither the trial court nor this reviewing court would have hesitated to uphold the validity of a search warrant issued under such evidence. We do hesitate to affirm that the officers had probable cause to break into a house without a search warrant and make an arrest on such evidence—as they clearly intended to do and, as the trial judge stated, he believed they intended to do.

That is a decision which fortuitously we do not have to make.

■ If a defendant freely consents to an entry and search of his home, his constitutional rights have not been violated. (*Castaneda* v. *Superior Court,* 59 Cal.2d 439, 442 [30 Cal. Rptr. 1, 380 P.2d 641].) ■ Where substantial evidence supports a preliminary finding by the trial court and the implied ultimate finding by the jury that a voluntary consent has been given, a reviewing court must accept consent freely given as a fact proven. (*People* v. *Bilderbach,* 62 Cal.2d 757, 762-763 [44 Cal.Rptr. 313, 401 P.2d 921] ; *People* v. *Jackson,* 191 Cal. App.2d 296, 300 [12 Cal.Rptr. 748].) We stress that the consent given must be free and voluntary and the evidence that it was must be truly *substantial.* ■ To protect his right to object to an unreasonable search or seizure, a defendant need not forcibly resist an officer's assertion of authority. (*Castaneda* v. *Superior Court, supra,* 59 Cal.2d 439, 442.) Permission obtained because of assertion of authority is constitutionally inadequate. (*People* v. *Smith,* 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222].) And acceptance by the trial court of a defendant's doubtful and indecisive acts—such as stepping aside to permit the entry of police officers—as sufficient to justify a finding of free-consent has been criticized (see Manwaring, *op. cit.,* 16 Stan. L. Rev. 318, at p. 331). But the trial court's determination of freely given consent based upon an officer's testimony that the defendant used language such as "Come in and look; I've got nothing to hide," etc. has been held to be substantial evidence binding upon a reviewing court. (Manwaring, *op. cit.,* 16 Stan. L. Rev. 318, at p. 331; *People* v. *McLean,* 56 Cal.2d 660, 664 [16 Cal.Rptr. 347, 365 P.2d 403] ; *People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241].)

728

■ In the case at bench evidence by the police officers that the defendant gave a voluntary consent to search was unequivocal. Under this testimony we do not have merely an implied permission, nor do we have a consent which was actually an attempt to throw the officers off the scent by a defendant who was already under arrest as was true in *Castaneda* v. *Superior Court, supra,* 59 Cal.2d 439, and in *People* v. *Currier,* 232 Cal.App.2d 103, 108 [42 Cal.Rptr. 562], nor do we have permission granted only because of the officers' assertion of authority. Here, as regards the original entry, the officers testified they asked and were granted express permission. They did not indicate their actual but unspoken intent to force their way in. Neither did they act upon it. They did not indicate any intent to arrest defendant, and at the time did not have such an intent. Even defendant's testimony (corroborated by Mrs. Wright) evidenced, if true, no wish by defendant actually to deny the officers' permission of entry. Defendant only suggested a momentary delay while he put on his trousers (interpretable as motivated by the presence of a woman, Mrs. Wright, a delay made unnecessary by the latter's dismissal). Although the testimony conflicts sharply as to what happened after the original entry, the testimony of the officers is, again, unequivocal. According to them, they asked and were granted permission to search the whole premises. Their testimony is that defendant not only gave permission to search the bedroom; he led the way. Defendant would have us disbelieve this testimony as too improbable for belief. We cannot say, however, that it was. Defendant's behavior in other respects had been so bizarre all that night that it does not overstrain our credulity to believe that defendant deemed the hiding place of the money (the fly of his trousers) to be so unusual it would escape the officers' notice. It is believable that he thought he was safe in seeming to encourage the search. Such reasoning, apparently accepted by the trial court and jury, does not shock the judicial conscience of this court. That being so, the test of the substantial evidence rule is satisfied and our powers as a reviewing court end. (See *People* v. *Hall,* 62 Cal.2d 104, 109-110 [41 Cal.Rptr. 284, 396 P.2d 700], and cases there cited. See particularly Jaffe, *Judicial Review, Question of Fact,* 69 Harv. L. Rev. 1020, 1026-1031.)

■ Defendant argues that there was a duty on the part of the officers not only to ask permission to enter and search; that there was also a duty to explain to defendant that it was his constitutional right to refuse permission. Failure to give

such advice may, under the circumstances of a given case, be a factor to be taken into consideration in determining whether or not a *free* consent was actually given. (*People* v. *Wilson,* 145 Cal.App.2d 1, 7 [301 P.2d 974].) Standing alone, however, it has been held not to be a decisive omission. (*People* v. *Burch,* 196 Cal.App.2d 754, 767 [17 Cal.Rptr. 102].)

Defendant argues that since *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], such advice has become as indispensable as the prerequisite warning which must now be given before interrogation. We are not so convinced. Our Supreme Court has given no indication that it will equate a warning before consented-to search with a warning before interrogation. In *People* v. *Bilderbach, supra,* 62 Cal.2d 757 (decided after *Escobedo* and *Dorado*) the court reversed for a failure of the police to warn before interrogation but asserted as advice to the court on retrial that a finding of a voluntary consent to search was not precluded. ██ Moreover, under the facts of this case, the conditions of the *Escobedo-Dorado* rule were not present. Defendant was not in custody and when permission to enter and search was sought, there was no then-existent intent to take him into custody. Again we are impressed by the argument of the Attorney General that the very request for permission to enter and search imports advice that a negative response is within the defendant's rights—when, as here, the implied finding is that the inquiries to the effect ''may we enter'' and ''may we search'' would be understood by the person questioned to be more than merely rhetorical. ██ No pronouncement by the United States Supreme Court has made a warning of constitutional rights a prerequisite to a police officer's solicitation and obtaining of permission to enter and search.

### RE THE CONTENTION DEFENDANT'S EXTRAJUDICIAL STATEMENTS WERE IMPROPERLY ADMITTED

Defendant does not quarrel with the admission into evidence of his answers to police questioning at his home before the discovery of the money and the still wet clothing. He argues that from that point on he was in custody even though the police did not expressly inform him he was under arrest. We agree with that. His contention is that the warning then given defendant of his right to remain silent and to have an attorney was not adequate. In that connection it is also urged the officers' testimony regarding the warning was so contradictory as

730

to be unbelievable. With the latter argument we cannot agree. Officer Relles testified: "At that time Officer Kunz stepped in and advised Mr. Roberts of his constitutional rights and his right to remain silent, right to an attorney at any and all stages." (Although to impeach this testimony defense counsel brought out that at the preliminary hearing Officer Relles had said that *he* had given the warning, Mr. Relles explained this was a mistake. He had corrected the mistake at the same hearing on the same day.) Officer Kunz also testified at the trial that he had given the warning. He testified: ". . . Advised him of his constitutional rights, his right to an attorney, his right to remain silent at all stages during the conversation." He also testified that although he could not remember the words defendant used he indicated he understood his rights.

The statements made during interrogation at the police station were after a written waiver which we have quoted above. The fact that defendant (in his own handwriting) inserted a time earlier than the interrogation then being carried on (but approximately at the time of the answers given at his home) is only significant, if it has any significance at all, because defendant desired to make it clear that at the very outset of his conversations with the police officer he intended to answer questions and to waive an understood right to have an attorney.

 Were the warnings given sufficient to fulfill the requirements of the law? They were, as we have stated above, sufficient to comply with the mandates of *Escobedo* and *Dorado*. They were insufficient to comply with the warning required by *Miranda* v. *Arizona, supra,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], because defendant was not warned that anything he might say could be used against him and was not informed of his right, if indigent, to have an attorney assigned who would have a right to be present at the interview. As we have also stated, the question whether the *Miranda* rule applies to this case is one we do not have to decide. Our decision rests upon the fact that whether or not it was error to admit the statements the error was harmless.

RE THE QUESTION WHETHER THERE WAS PREJUDICIAL ERROR

 California's Constitution, article VI, section 4½,* provides that judgments, including criminal judgments, will

---

*Reporter's Note: Now art. VI, § 13. See constitutional revision adopted November 8, 1966.

only be reversed when there has been a miscarriage of justice. As applied to criminal cases in which error violates a defendant's constitutional rights that rule has been given restrictive application. First, if the error consists of admission of a confession, the error is prejudicial per se. (*People* v. *Dorado, supra.*) When it consists of an inculpatory statement less than a confession, the test applied in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], is "That a 'miscarriage of justice' should be declared only when the court 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." Justice Peters in his separate opinion in *People* v. *Modesto,* 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753], at page 462, suggests that the United States Supreme Court may require that a stricter rule be applied, to wit, that error " ' "shall be regarded good ground for a new trial *in all cases where the proofs of guilt are not so clear and conclusive that the court can say affirmatively the accused could not have been harmed from that cause.*" ' "

In a case presenting as many factual facets as does this one it may be claimed that a reviewing court acts with temerity in essaying the assertion with confidence that no jury could reasonably have acquitted defendant under the evidence *legally* before it in this case after excluding and erasing from consideration both the questioned extrajudicial statements *plus* that portion of the testimony given by defendant (but inimical to his cause) which could have been the product of the extrajudicial statements. All such evidence we must and do exclude. (*People* v. *Smith,* 63 Cal.2d 779, 803 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Davis,* 62 Cal.2d 791, 796 [44 Cal.Rptr. 454, 402 P.2d 142].) Nevertheless, excluding such evidence, the case against defendant is so conclusive we hold that reasonable minds could not possibly fail to find him guilty. We summarize this proof:

1. The victim was found in a pool of blood, bludgeoned by a hammer taken from the supply room.

2. Beside him was an empty wallet. Incontrovertible evidence established not only substantially the exact sum but also the denomination of the bills which had been in that wallet just before the assault.

3. Undenied evidence established general knowledge among the janitors that the victim had a habit of carrying on his person large sums of money. (It will be recalled that the as-

sault took place a few days after payday.) This evidence was admissible. (2 Wigmore on Evidence (3d ed.) § 261, p. 83.)

4. A roll of bills in the same sum and of the same denominations as the bills in the victim's wallet the night of the assault was found the next morning hidden in the seam of the fly of the trousers defendant was known to have worn when he left the state building the night before.

5. Defendant was also shown to have been in great need of money at the time and date of the assault.

6. His testimony at the trial given to explain his possession of this money was weird and unbelievable (the purchase of syringes by three persons, all unnamed, two unknown to the defendant, in the middle of the night). That testimony was not born of any necessity arising from his extrajudicial statements.

7. The blood on defendant's clothing and—equally incriminating in fact—the presence of the substance, tentatively identified as blood, and only at the very portions of his trousers and shirt where the bleach appeared, were most incriminating factors.

8. Also very incriminating was the fact that defendant lied to the officers at the scene of the assault, denying he had changed his clothing that night.

9. The strange story told janitor Fegan as to how the bleach got on his clothing (nervousness produced by a phone conversation with a girl) was unbelievable.

10. Even stranger testimony was his story as to how the Clorox had been spilled. (This testimony again was not motivated by a need to explain any extrajudicial statement. Without *some* explanation, the very fact of self-applied bleach on his trousers was incriminatory.) And the testimony given of the course of the descent of the bottle of bleach to the floor, landing upright, was fantastic.

11. Then there was the fact that defendant was seen running down a hall where he had no reason to be at a time shortly after the assault was undoubtedly committed with the (again unbelievable) account he gave of how he happened to be running down the hall doing a dance called the "pony." (This testimony also was not the product of any illegally-admitted extrajudicial statement.)

The judgment is affirmed.

Friedman, J., and Regan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 25, 1967.