[Crim. No. 12603.   Second Dist., Div. Five.   Apr. 28, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. BILLY CALVIN GRIFFIN et al., Defendants and Appellants.

Malcolm H. Harris, Kendall E. Nungesser and Gladys Towles Root for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—Defendants Billy Calvin Griffin, Beatrice Nelson and Willie Robinson, each were found guilty of a violation of section 11530 (possession of marijuana) of the Health and Safety Code. They appeal claiming:

1. That the search and seizure which led to the discovery of the narcotic was illegal; and

2. That the evidence was insufficient to support the convictions.

The matter was tried to the court on the following stipulation:

"MR. FUKUTO: At this time, then, your Honor, the People will offer to stipulate that the People's case-in-chief may be submitted to the Court on the testimony taken at the time of these defendants' preliminary hearing; that the testimony of Witnesses John Howard Ryan [*sic*], Jr., Arthur J. Bascom, and Theodora Dayian, D-a-y-i-a-n, as recorded in the transcript of that preliminary hearing, shall be deemed to be the evidence before this Court, and specifically we will not submit to the Court under this stipulation the testimony of Willie Robinson given at the preliminary hearing, given on page 62, but the Court may read and consider that testimony with the same force and effect as though the witnesses therein named were here called, sworn, and testified to the matters contained in the transcript; that all stipulations entered into at that time are renewed for the purpose of this proceeding.

"The People's Exhibit No. 1, with all its subdivisions, which were received into evidence at the preliminary hearing, are received in evidence in this proceeding, bearing the same number, *subject to any lawful objection or motion to suppress*, and both sides reserving the right to present further testimony.

"So stipulate?

"MR. LANG: So Stipulate.

"MR. SPINDELL: So stipulate." (Italics added.)

All of the facts bearing on the legality of the seizure were presented by the People at the preliminary hearing where a proper objection to the introduction of the contraband in evi-

dence was made and overruled. There was no further objection at the trial.

The testimony at the preliminary hearing was as follows: Deputy Sheriff Ryon was cruising in his car at about 10:30 a.m. on August 19, 1965. This was a few days after the so-called Watts riots, in the heart of the former riot area. He received a call that there was a man with a gun at 1327 East 75th Street. He drove to the address which was just around the corner from where he had received the call. As he arrived he was confronted by a lady downstairs who told him that there was a man upstairs who had a gun and who had threatened her with it. She identified an upstairs apartment where the man was supposed to be. Ryon proceeded up the stairs. The door of the apartment in question was open. Defendant Beatrice Nelson stood in the door. Ryon's gun was drawn, as was the gun of Deputy Dayian who was immediately behind. Ryon asked Beatrice Nelson whether she minded if he came in and she said ''No.''

From that point on Ryon's recital of the events which led to the discovery of marijuana is somewhat conflicting. No attempt was made at the preliminary hearing to reconcile these conflicts which, perhaps, had surprised the prosecutor. Since the matter was submitted on the transcript of the preliminary hearing and there was no objection to the admission of the narcotics in the superior court, the People possibly did not think it worthwhile to attempt a reconciliation of Ryon's testimony.

On direct examination Ryon said that after Beatrice Nelson gave him permission he ''entered the location and observed'' Robinson and Griffin running into a bedroom. This he later corrected and said that they were ''heading toward the bedroom, not running . . . .'' He immediately proceeded toward the bedroom, but as he reached the bedroom door Griffin ''just backed away'' and went to some other part of the house. He followed Robinson into the bedroom, where he observed one Hollins with a rifle in his hand.

On cross-examination, this portion of the entry was described a little differently: Ryon was able to observe Griffin, who was heading toward the bedroom, through the open door of the apartment before he entered. He did not see Robinson who ''must have been in the bedroom.'' Hollins was at the bedroom door, going into the bedroom.

In any event after Ryon entered the bedroom, he observed Robinson ''stuffing something unknown to me . . . under-

neath the mattresses, in between the box springs and the mattress.'' He told Hollins to drop the rifle, which command was obeyed. He told Robinson to put up his hands. Robinson kept fiddling with something in his belt and withdrew a butcher knife which he dropped.[1]

Hollins and Robinson were ordered into the living room where they were arrested by another officer. Ryon searched under the mattress and discovered numerous new suits of clothing and a brown bag containing a quantity of marijuana.

A later search of Robinson and Griffin revealed marijuana debris in their trouser pockets. Griffin's trousers also contained an Alpine cigarette package with a half-smoked marijuana cigarette in it.

Both Nelson and Griffin were questioned after warnings which complied with the requirements of *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].[2] The only matters favorable to the prosecution which were developed were these: Griffin acknowledged that he had lived in the apartment in question for a week and a half and that Beatrice Nelson lived there with him. He knew what marijuana looked like, but disclaimed any knowledge that there had been any in the apartment. Nelson agreed that she had been living in the apartment. She too said that she recognized marijuana, but had never seen the narcotics found under the mattress.

At the trial each of the defendants testified. Defendants Nelson and Robinson also produced one Patricia Garnett, a baby-sitter, who had spent the preceding night in the apartment in question and left just before the police arrived. It is quite clear that the trial court gave very little credence to any of the defense testimony.

The baby-sitter testified that she and Beatrice Nelson slept in the living room. Defendant Nelson's children were in one bedroom, no one occupied the one where the clothing and the marijuana were found. Sometime after midnight a woman by the name of Janie came to the apartment.[3] Nelson was clean-

---

[1] On cross-examination these events were also described somewhat differently: Ryon did not see the rifle when he first entered the bedroom. He first observed it when he later lifted the mattress.

[2] The trial started in December 1965.

[3] Janie appears to be the lady who directed the officers upstairs when they first arrived. Throughout the transcript there is vague testimony that during the night there was some kind of a disturbance at the apartment house in question, but nobody ever explained precisely what it was all about.

ing up the kitchen at the time, Janie went into the kitchen to talk to her, left the kitchen, went to the bedroom and was observed putting a package under the mattress. After Janie left the baby-sitter told Nelson about the package. Nelson did not say anything. This was admitted by Nelson when she testified, but she "really didn't think about it" at the time and forgot to look under the mattress to see what it was because of a disturbance later that night when someone tried to break into her apartment.

The marijuana debris in Robinson's pocket was explained as follows: At about 9 a.m. Janie and Robinson came into the apartment, Janie put what looked like a marijuana cigarette into Robinson's pocket, but he took it out and returned it to her.

Griffin attempted to explain the marijuana debris in his pants as follows: He had been out drinking and had "wasted a drink" on his pants. He came home about 10 a.m. and grabbed a pair of bermuda shorts from the pile of clothing in the bedroom and "about that time the police came." He could not explain the marijuana cigarette in the package of Alpine cigarettes. His testimony suggested that it was planted by the police.

### The Failure to Object in the
### Superior Court

Normally the failure to object to the admission of the contraband in the superior court would preclude us from determining the merits of any contention that it was illegally obtained. (*People* v. *Decker*, 155 Cal.App.2d 165, 169-170 [317 P.2d 135].) The stipulation set forth at the beginning of this opinion is perhaps susceptible to the construction that by its very language it resubmits to the superior court all objections and motions made before the magistrate. While we doubt whether that was really the intent, the benefit of any uncertainty should go to defendants. We strongly recommend that in these cases where there is a submission on the preliminary transcript, the stipulation be phrased in such a way that the record is not booby-trapped with possibilities for error in matters to which the attention of the trial court is never directed.

### The Legality of the Search and Seizure.

The Attorney General urges that Ryon's entry into the apartment was consented to by Nelson. This approach opens a host of problems. Even if an implied finding of consent had support in the evidence—two officers with drawn

guns!—we would still be faced with the question, left undecided in *People* v. *Henry,* 65 Cal.2d 842, 846 [56 Cal.Rptr. 485, 423 P.2d 557] whether the People can rely on consent in the absence of proof that defendant Nelson was advised of her constitutional right not to consent.[4]

When Deputy Ryon entered the apartment in question he had a report from a person who claimed to be the victim of a felony, a violation of section 245 of the Penal Code—assault with a deadly weapon.[5] There was no need to phrase the accusation more precisely. (*People* v. *Kilvington,* 104 Cal. 86, 92-93 [37 P. 799, 43 Am.St.Rep. 73].)

If Ryon was authorized to make an arrest, the entry without consent was legal although not all the requirements prescribed by section 844 of the Penal Code were complied with. Defendants urge that there was no authority to arrest, because Ryon did not act on information from a "credible informant." Such information is not always necessary. (*Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36].)

Here the purported victim had told him that her assailant was in the apartment. When the officer appeared two of the occupants of the apartment—either Griffin and Robinson or Griffin and Hollins—apparently fled, thus corroborating her story to some extent. We explain why we think Ryon was entitled to attempt an arrest:

One cannot approach the problem of informants whose information may or may not be sufficient to create "probable cause" as if there were only two classes: reliable informants whose information has previously been tested by the police and "all others." A multitude of cases, some of which are cited in the footnote,[6] attest to the fact that information from

---

[4]The People rely on *People* v. *Roberts,* 246 Cal.App.2d 715 [55 Cal. Rptr. 62] which says that the police need not explain that the person from whom consent is sought need not give it. The court, in *Roberts,* thought that our Supreme Court had so ruled by implication in *People* v. *Bilderbach,* 62 Cal.2d 757 [44 Cal.Rptr. 313, 401 P.2d 921]. However sound such reasoning may have been when *People* v. *Roberts* was filed in November 1966, *People* v. *Henry, supra,* filed months later, indicates that our Supreme Court still considers the question an open one.

[5]Defendants argue that the information concerning such a crime came from an unidentified deputy sheriff, a deputy who never testified. They rely on *People* v. *Pease,* 242 Cal.App.2d 442 [51 Cal.Rptr. 488]. That case is not in point. The radio call simply brought Ryon to the scene. He then received his information directly from the alleged victim of the crime.

[6]*People* v. *Brite,* 9 Cal.2d 666 [72 P.2d 122]; *People* v. *Kilvington,* 104 Cal. 86, 92-93 [37 P. 799, 43 Am.St.Rep. 73]; *People* v. *Brooks,* 234 Cal.App.2d 662 [44 Cal.Rptr. 661]; *People* v. *Hanamoto,* 234 Cal.App.2d

a citizen who purports to be the victim of or to have witnessed a crime may, under certain circumstances, provide a sufficient basis for an arrest.

The entire problem was recently canvassed by division four of this court in *People* v. *Lewis,* 240 Cal.App.2d 546, 549-550 [49 Cal.Rptr. 579] : "In bookmaking and narcotics cases the courts have developed the concept of the 'reliable informant,' which, in that context means a person who has previously given the police information which has been found to be true. By that standard a known criminal, a drug addict, or even an anonymous voice on the telephone may become a 'reliable informant,' upon whose word the police may make warrantless arrests, break in doors and conduct searches. (See, e.g., *People* v. *Prewitt,* 52 Cal.2d 330 [341 P.2d 1].)

"But experienced stool pigeons are not the only sources of credible information, and the tests of reliability which must be applied to such persons are not necessarily applicable to every citizen who assists the police.

"Bookmaking and narcotics offenses are crimes which are usually committed in the presence only of the criminals themselves, where there is no innocent victim to complain. The persons most likely to furnish information are themselves criminally involved or disposed, and their reports to the police are generally motivated by something other than good citizenship. Such an informer rarely offers himself as a witness to crimes already committed. His usual function is to supply a tip in confidence whereby the police may witness a crime or uncover evidence of it for themselves. A citizen such as Mr. Owens, who reports a crime committed in his presence, is more than a mere informer. He is an observer of criminal activity who, by calling the police, acts openly in aid of law enforcement.

"Courts have not hesitated to find it reasonable for police officers to act upon the reports of such observers."

The authorities thus establish that Ryon had probable cause to make an arrest.

Once it is shown that Ryon could enter the apartment, without consent, in order to make an arrest, the People's case on the legality of the search is all downhill. Compliance with section 844 of the Penal Code was excused, if for no other

---

6 [44 Cal.Rptr. 153] ; *People* v. *Wright,* 216 Cal.App.2d 866 [31 Cal.Rptr. 432] ; *Cole* v. *Johnson,* 197 Cal.App.2d 788, 793 [17 Cal.Rptr. 644] ; *Gorlack* v. *Ferrari,* 184 Cal.App.2d 702 [7 Cal.Rptr. 699] ; *People* v. *Paul,* 147 Cal.App.2d 609 [305 P.2d 996].

552

reason, on the basis that it would have increased the peril of the officer, had he stopped to explain to defendant Nelson why he was entering the apartment. (*Ker* v. *California*, 374 U.S. 23, 39-40 [10 L.Ed.2d 726, 741-742, 83 S.Ct. 1623]; *People* v. *Smith*, 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Hammond*, 54 Cal.2d 846, 854 [9 Cal.Rptr. 233, 357 P.2d 289]; *People* v. *Maddox*, 46 Cal.2d 301, 306 [294 P.2d 6].) When Ryon saw two suspects, then apparently unarmed, he was certainly entitled to take immediate action to prevent them from gaining possession of a weapon which he had reason to believe was in the apartment.

The search under the mattress can be upheld on several grounds. First, Ryon could reasonably assume that what was being hidden was a weapon. This assumption was justified whether or not Hollins was exhibiting one at that moment. Second, the right to make an arrest having arisen, the search under the mattress was authorized as being incidental thereto. although it preceded the actual arrest by a few moments. (*People* v. *Cockrell*, 63 Cal.2d 659, 666 [47 Cal.Rptr. 788, 408 P.2d 116].)

### Sufficiency of the Evidence— Griffin and Robinson.

■ Little has to be said concerning the sufficiency of the evidence to convict Griffin and Robinson. Griffin's conviction can of course be upheld merely on the evidence of his possession of the marijuana cigarette in the Alpine package. His apparent attempt to avoid contact with Ryon as soon as the officer entered the apartment supplies the necessary element of knowledge. Robinson appeared to exercise some kind of dominion and control over whatever was under the mattress. The fact that he made straight for the bedroom when the officer entered indicates a consciousness of guilt and the debris found on him strongly suggests that marijuana was at least one of the things on his mind.

*People* v. *Leal*, 64 Cal.2d 504 [50 Cal.Rptr. 777, 413 P.2d 665], relied on by both defendants is not in point. There the nonusable quantity of narcotics was found to be insufficient as a basis for conviction. Here the debris is substantial evidence linking Robinson to a much larger quantity. As the court recognized in *Leal*: "We do not say, however, that the discovery of traces of narcotics in a defendant's possession is without legal significance. Clearly, the presence of those traces may serve as evidence in the proof of many types of narcotics offenses." (*Ibid.*, p. 512.)

*Sufficiency of the Evidence—Nelson.*

As the trial court recognized, Nelson presents a slightly different problem. There is ample evidence in the record that the bed in which the marijuana was found was hers. An unlikely story that she slept on the living room floor during the night in question did not have to be believed. She herself testified that she had stolen the clothing found in her bedroom and brought it to the apartment. Just before the police arrived on the premises she asked that the clothing be removed from a closet and put under the mattress. From this the trial court was entitled to infer a proclivity to use the space under the mattress as a hiding place. Somebody hid the marijuana there and we cannot say that it was unreasonable to infer that it was she. If she hid the marijuana, that was adequate circumstantial evidence of the fact that she was aware of the narcotic nature of the substance. (*People* v. *Winston,* 46 Cal.2d 151, 158 [293 P.2d 40] ; *People* v. *Groom,* 60 Cal.2d 694, 697 [36 Cal.Rptr. 327, 388 P.2d 359] ; *People* v. *Berti,* 178 Cal.App.2d 872, 877 [3 Cal.Rptr. 51] ; see also *People* v. *Millum,* 42 Cal.2d 524 [267 P.2d 1039].)

The judgment is affirmed.

Hufstedler, J., and Stephens, J., concurred.