[Crim. No. 17361. Second Dist., Div. Five. Nov. 20, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
RUDOLPH THOMAS, Defendant and Appellant.

---

---

## COUNSEL

Philip J. Catanzaro, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Lawrence P. Scherb II, Deputy Attorney General, for Plaintiff and Respondent.

---

## OPINION

**KAUS, P. J.**—Defendant was charged by information with possession of heroin for sale. (Health & Saf. Code, § 11500.5.) He pleaded not guilty. A motion under section 995 of the Penal Code was denied. A motion under section 1538.5 of the Penal Code was submitted on the transcript of the preliminary hearing, plus additional testimony by defendant and by the arresting officer. The motion was denied. Jury trial was duly waived. Defendant was found guilty as charged and sentenced to state prison. The appeal is from the judgment of conviction.

For about one month prior to September 27, 1967, Sergeant Gouge of the Los Angeles Police Department had been receiving information about defendant from four different sources. This information consisted of defendant's address and apartment number and the facts that he was selling heroin, that he had recently purchased a red Mustang and that he was using the automobile to deliver the heroin. The informers advised the officer that they had observed narcotics in defendant's apartment and had seen others buying narcotics from defendant. Gouge had previously received information from three of the four informers and this information had led to arrests and convictions of a number of persons of whom the officer named four. Gouge had received information concerning defendant from his informers as recently as September 26, 1967. He was not told, however, how recently the informers had seen heroin in the apartment.

After receiving this information Gouge secured a photograph of defendant and directed the police department intelligence division to run a check

on the utilities. The officer believed that they had come back listed to "Rudy Thomas." On September 26, 1967, Gouge went out and observed the location. On September 27, at about 8:45 a.m., Gouge placed defendant's apartment building under surveillance. At 10 a.m. he saw defendant leave the building and walk to a red Mustang parked in an adjacent carport. Gouge was in a parked automobile some 50 feet east of the driveway. He made no effort to stop defendant, who had to walk some 20 or 30 feet along the sidewalk from the building entrance to the carport, although he recognized defendant as the man he was seeking. After defendant reached his car, Gouge drove his police vehicle into the carport, about 20 feet from the Mustang, alighted, approached defendant, identified himself as a police officer and asked defendant for identification. Defendant produced a driver's license. Gouge told defendant that he had information that defendant was selling narcotics. Defendant replied, "I don't fool with the stuff. You may search me if you wish." Gouge made a cursory search which apparently proved negative.

At about this time Officers Northey and Walker who had accompanied Gouge to the location in a second police car walked into the carport. Gouge asked defendant if he had any narcotics in his automobile. Defendant stated that he did not and that the officer could search the car. After another fruitless search Gouge asked defendant if he had any narcotics in his apartment and defendant replied that he did not. Gouge asked if they could search the apartment. Defendant replied, "I don't have anything in the apartment. You may search it, but don't tear it up."

Defendant and the three officers then walked to defendant's apartment. To reach the apartment which was on the second floor, they had to leave the carport, walk down the sidewalk 20 to 30 feet to the building entrance and then walk down a breezeway another 20 to 30 feet to the stairway. At the apartment door defendant took a key from his pocket, inserted it in the lock and asked Gouge if he had a search warrant. Gouge replied that he did not. Defendant then said, pointing to Northey: "Well, I am going to let you search anyway, because he looks so innocent." He unlocked the door and the officers entered. During the search which followed, two balloons and a condom, each containing heroin, fell from an ironing board cover. Gouge testified that based on his expertise he had formed the opinion that the heroin was possessed for sale. Over $1,000 in currency was also found.

Defendant was formally arrested. He was then, for the first time, advised of his constitutional rights. (*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) During an ensuing conversation defendant said that he lived alone in the apartment, but that he did, on occasion, have female visitors.

At the hearing on the motion to suppress, defendant denied having consented to the search and claimed, in contradiction of Gouge's testimony, that the officer had approached him with drawn gun and had parked his police car directly behind defendant's Mustang, blocking his exit.

At the trial the defense was that on the date of his arrest defendant was living in the apartment with a lady whose name was Thelma Jackson, but who also had been known as Barbara Jackson, Donna Long, and Donna Green. At that time he had known her for about a year. She had signed the lease to the apartment. When he had started to live with Thelma he knew that she had used narcotics in the past and warned her against further use. Nevertheless on one occasion he had caught her giving herself an injection. When the officers came to the apartment he did not know that any heroin had been hidden behind the ironing board. He had never used the board. Thelma had used it several times. Most of the money which the officers had found had been saved by defendant and Thelma. Thelma kept her clothes in the apartment. Defendant produced a rent receipt to "T. Thomas" and a telephone bill addressed to Barbara Jackson. By stipulation the court received a 1965 arrest report showing that a Thelma La Forbes had been arrested for possession of heroin on May 19, of that year. Also admitted in evidence was a "make sheet" on one Thelma Fallings, showing that between 1949 and 1965 she had been charged with various crimes under the following names: Gladys Battle, Thelma Baul, Thelma Baul Reese, Thelma Walsh, Adelaide Whiting, Thelma La Forbes, and Thelma Fallings. In rather garbled fashion, the prosecution and the defense stipulated that the lady to whom the two exhibits referred, was the one "that we have been discussing."

Defendant testified that when he was admitted to bail on the day after his arrest and returned to his apartment, Thelma had left. He had no idea where she was at the time of the trial. He could not recall being asked by the arresting officers whether anyone else was living in the apartment. He did not tell them that Thelma was living there. He merely told them that he knew nothing about the heroin that was found. Defendant was impeached with four prior felonies, two for robbery, one for grand theft, and one for possession of narcotics.

In rebuttal the People offered proof that no women's clothes were found during the search of the apartment.

At the preliminary hearing defendant requested that Officer Gouge be ordered to reveal the names of the informers. His counsel gave the following reason: "Now the question of whether or not the narcotics found in the ironing board was put there by the so-called informers or by the defendant *or some other person,* I think under the recent cases, the *Garcia* case and other

District Court cases, we are entitled to know the identity of this person who was in the apartment and a precipient [*sic*] witness to the transactions." (Italics added.) The request was denied, Officer Gouge having testified that he felt that the informers "would be in great bodily harm and possibly deaths if their identity were known; that their value to the People of the State of California would be destroyed." The magistrate stated that it did not appear "at this time" that the informers would be material witnesses. Motions to strike Gouge's testimony and to dismiss were also denied. We have not found any further reference to the matter in the record.

On appeal defendant contends that neither the arrest nor his consent can justify the warrantless search of his apartment. He further claims that his conviction should be reversed because the prosecution withheld the names of the informers.

## The Search

It was the prosecution's position that defendant was not arrested until after the heroin was found. ▉ If that was so, the arrest obviously cannot justify the antecedent search. On the other hand, if the justification for the search is to be found in probable cause to arrest and the fact that the search and the arrest were "substantially contemporaneous" (*People v. Cockrell,* 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116]), that probable cause was present when the officers confronted Thomas at his car, outside of the apartment. No search of the apartment could validly follow. (*Vale v. Louisiana,* 399 U.S. 30 [26 L.Ed.2d 409, 90 S.Ct. 1969]; *People v. Henry,* 65 Cal.2d 842, 845-846 [56 Cal.Rptr. 485, 423 P.2d 557].)

The only possible legal basis for the search is, therefore, defendant's consent.

Defendant does not argue that his consent was invalid because he was not advised of his Fourth Amendment rights.[1]▉ He does claim, however,

---

[1]Neither the United States Supreme Court, nor our own, has ever decided the question whether a valid consent to a warrantless search must be preceded by a warning to the effect that such consent may be withheld. A long line of Court of Appeal decisions starting with *People v. Roberts,* 246 Cal.App.2d 715, 729 [55 Cal. Rptr. 62], and presently ending with *People v. Hidalgo,* 7 Cal.App.3d 525, 529 [86 Cal.Rptr. 660], answers the question in the negative. A Supreme Court dictum in *People v. Superior Court,* 71 Cal.2d 265, 270, fn. 7 [78 Cal.Rptr. 210, 455 P.2d 146], appears to agree, in spite of earlier hints to the contrary (*Parrish v. Civil Service Commission,* 66 Cal.2d 260, 270, fn. 10 [57 Cal.Rptr. 623, 425 P.2d 223]; *People v. Henry,* 65 Cal.2d 842, 846 [56 Cal.Rptr. 485, 423 P.2d 557]). Federal decisions go both ways. (Cf. *United States v. Nikrasch,* 367 F.2d 740, 744 and *United States v. Blalock,* 255 F. Supp. 268 with *United States* ex rel. *Harris v. Hendricks,* 423 F.2d 1096, 1101, *United States* ex rel. *Combs v. LaVallee,* 417 F.2d 523, 525-526 and *Gorman v. United States,* 380 F.2d 158, 165.) In *Gorman v. United States, supra,* at page 164, the defendant had been given his *Miranda* rights. The court held that "advocacy of an automatic second-warning system misunderstands and downgrades the warnings required by *Miranda.*"

that before he consented to the search of the apartment, he was in custody in the *Miranda* sense and should have been advised of his Fifth Amendment rights. It is then further argued that the consent was an incriminating communication within the meaning of the Fifth Amendment and that it was vitiated by the lack of *Miranda* warnings.

We assume that whether or not defendant was actually arrested outside of the apartment,[2] he was, at that time, "physically deprived of his freedom of action" in a significant way or, at least, "led to believe, as a reasonable person, that he [was] so deprived," that the officers were obligated to advise him of his Fifth Amendment rights and to secure a waiver thereof, if they hoped to use any statement by defendant. (*People* v. *Arnold*, 66 Cal.2d 438, 448 [58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Wright*, 273 Cal. App.2d 325, 333-334 [78 Cal.Rptr. 75]; *People* v. *Chavira*, 253 Cal.App. 2d 928, 932 [61 Cal.Rptr. 407].) The question, therefore, is whether a consent to search is the kind of statement that *Miranda* is all about.

We have found no California case which squarely decides the issue. Authority from other jurisdictions is conflicting. In *State* v. *Williams*, 248 Ore. 85 [432 P.2d 679], the Supreme Court of Oregon held in favor of defendant's present contention: "In effect, the request to search is a request that defendant be a witness against himself which he is privileged to refuse under the Fifth Amendment. *Miranda* v. *Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), made it clear that preinterrogation warning by the police was necessary to safeguard this Fifth Amendment privilege . . . The Fifth Amendment privilege is recognized in these cases because its application was deemed necessary as a prophylaxis against coercive police practices. The same prophylaxis is necessary whether the interrogation is used to obtain a confession or to establish a suspect's guilt through his disclosure of evidence pointing to his guilt."

Six jurisdictions have disagreed with the Oregon court. They are Kansas (*State* v. *Stein*, 203 Kan. 638, 639-640 [456 P.2d 1, 2-3]; *State* v. *McCarty*, 199 Kan. 116, 118 [427 P.2d 616, 619-620]), Illinois (*People* v. *Trent*, 85 Ill.App.2d 157, 161-162 [228 N.E.2d 535, 537-538]), Maryland (*Lamot* v. *State*, 2 Md.App. 378, 385 [234 A.2d 615, 619-620]), Nebraska (*State* v. *Forney*, 182 Neb. 802, 804-805 [157 N.W.2d 403, 404-405]), Idaho (*State* v. *Oldham*, 92 Idaho 124, 132 [438 P.2d 275, 283]) and Colorado (*Phillips* v. *People*, —— Colo. —— [462 P.2d 594]). The weight of precedent from other jurisdictions thus hardly supports defendant's position.

A decision of our Supreme Court which is factually similar is *People* v.

---

[2] Officer Gouge testified that defendant would not have been arrested, had no narcotics been found.

*Smith,* 63 Cal.2d 779 [48 Cal.Rptr. 382, 409 P.2d 222]. There, one of the codefendants was a Mrs. Walker. She was questioned after she had been taken into custody. She made certain incriminating statements. She also consented to the search of her home. In reversing the conviction as to her, the Supreme Court held that the incriminating statements should not have been admitted in view of the violation of the rule set forth in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], as explained in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. With respect to the search, however, the court had no trouble at all sustaining it on the basis that Mrs. Walker had voluntarily consented thereto.[3]

Unfortunately *People* v. *Smith, supra,* is not too compelling an authority. The point at issue in the case at bar was not argued and thus, not decided.[4]

As we see it the answer to the problem before us depends on whether by requesting and obtaining the defendant's consent for the search of his apartment the police violated a value which *Miranda* was designed to protect. The question is not whether, had the *Miranda* warnings been given, defendant would have consented to the search. It may well be that, after being advised of his rights, he would have decided not to cooperate with the police in any way until he had a chance to confer with counsel. What we must decide is whether the Supreme Court's insistence that an opportunity so to confer be furnished at a particular stage of the criminal investigation was designed to obviate voluntary waivers of Fourth Amendment rights. To use an analogy from an entirely different field: a violation of a statute is of no effect in a negligence action unless it was the purpose of the statute to protect the interest invaded "against the kind of harm which has resulted." (Rest.2d Torts, § 286 (c); *Nunneley* v. *Edgar Hotel,* 36 Cal.2d 493, 496-500 [225 P.2d 497].)

---

[3]The articles found during the search incriminated Mrs. Walker and her codefendants. Their admissibility as to the codefendants does not depend on an implied holding that the failure to advise Mrs. Walker of her right to silence did not vitiate her consent. As the court explained in the later decision of *People* v. *Varnum,* 66 Cal.2d 808, 811-813 [59 Cal.Rptr. 108, 427 P.2d 772], Fifth Amendment rights are personal and the codefendants would have had no standing to complain of the failure to warn Mrs. Walker.

[4]It should also be noted that *People* v. *Smith, supra,* was decided in January 1966, several months before *Miranda.* Although our Supreme Court had clearly perceived that *Escobedo* was, among other things perhaps, a Fifth Amendment case (*In re Lopez,* 62 Cal.2d 368, 372-376 [42 Cal.Rptr. 188, 398 P.2d 380]), it is difficult to say that a pre-*Miranda* decision of the California Supreme Court explicates the ambit of that United States Supreme Court decision, not yet filed. This is particularly true when we consider that the contours of the Fifth Amendment were not nearly as clear in January, 1966, as they are now in the light of such cases as *Schmerber* v. *California,* 384 U.S. 757, 761 [16 L.Ed.2d 908, 914, 86 S.Ct. 1826]; *United States* v. *Wade,* 388 U.S. 218, 221-223 [18 L.Ed.2d 1149, 1153-1155, 87 S.Ct. 1926]; and *Gilbert* v. *California,* 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1182-1183, 87 S.Ct. 1951].

It is fortuitous that the defendant in a negligence case has violated his obligation to guard against a risk other than the one which injured plaintiff. It is similarly fortuitous that, if the officers had complied with *Miranda*, defendant might have withheld his consent. The inquiry is, as we have stated, whether the rationale of *Miranda* extends to post-arrest consents to searches which turn up incriminating evidence.

Reasonable minds may differ as to exactly what the Supreme Court attempted to achieve in *Miranda*. It may be that the four-pronged warning which *Miranda* prescribed was merely designed as a prophylactic against coercion in traditional terms. Perhaps, as at least one writer has suggested, the decision "is founded upon a more fundamental and far-reaching premise: no conviction should rest upon the defendant's statements unless they were made while the defendant was aware of his constitutional right to remain silent and the consequences of relinquishing that right." (Note, *Consent Searches: A Reappraisal After Miranda v. Arizona*, 67 Colum.L.Rev. 130, 139.) ██ However one interprets *Miranda*, what becomes subject to exclusion when a warning is not given although the situation calls for one, are "statements, whether exculpatory or inculpatory, stemming from custodial interrogation. . . ." (*Miranda v. Arizona, supra*, 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) While the writer of the comment just referred to maintains that a consent to a search is "clearly a 'communication' within the meaning of the *Schmerber* [*Schmerber v. California*, 384 U.S. 757] standard" (67 Colum.L.Rev. at p. 135), we disagree. ██ A consent to search, as such, is neither testimonial, nor communicative in the Fifth Amendment sense. If appearing in a lineup and speaking words used by a robber is not a "disclosure of any knowledge [the accused] might have" (*United States v. Wade*, 388 U.S. 218, 222 [18 L.Ed.2d 1149, 1155, 87 S.Ct. 1926]), neither is a consent to search. The fact that the search leads to incriminating evidence does not make the consent testimonial, any more than the victim's identification at the lineup gives such a quality to the words spoken by the suspect.

The difference between utterances which are communicative in character and those which are not is pointed up by *People v. Varnum*, 66 Cal.2d 808, 811-813 [59 Cal.Rptr. 108, 427 P.2d 772]. There the police were looking for a gun which had been used in a robbery. One robber, who had confessed, telephoned his wife, who was also a suspect, and asked her to reveal the hiding place of the gun. The wife did so and the gun was found in the place she indicated. Neither the husband nor the wife had been advised of their constitutional rights. The court held that: "Under these circumstances information and physical evidence secured as a result of questioning the Jacksons without warning them of their rights could not be used against them." Does

it make a difference of constitutional proportions that the unwarned suspect is asked to reveal the place where evidence is hidden, rather than to give consent to a search in the course of which the police may come upon it?

That, in practical effect, the difference is slight cannot be doubted. Yet so is the difference between a defendant's statement that he has consumed a half dozen martinis and the forcible taking of a blood sample (*Schmerber* v. *California,* 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]), or between his admission to having signed an instrument and the furnishing of an exemplar (*Gilbert* v. *California,* 388 U.S. 263, 266-267 [18 L.Ed.2d 1178, 1182-1183, 87 S.Ct. 1951]; *People* v. *Graves,* 64 Cal.2d 208, 210-211 [49 Cal.Rptr. 386, 411 P.2d 114]). Nor will a masked robber who was identified at a lineup after speaking the words used in a robbery, find much solace in the fact that his conviction was not obtained through a violation of his Fifth Amendment rights. (*United States* v. *Wade,* 388 U.S. 218, 221-223 [18 L.Ed.2d 1149, 1153-1155, 87 S.Ct. 1926]; *People* v. *Ellis,* 65 Cal.2d 529, 533-536 [55 Cal.Rptr. 385, 421 P.2d 393].) Nevertheless, as long as Fifth Amendment protection is confined to "evidence of a testimonial or communicative nature" (*Schmerber* v. *California, supra,* 384 U.S. at p. 761 [16 L.Ed.2d at p. 914]; *United States* v. *Wade, supra,* 388 U.S. at p. 221 [18 L.Ed.2d at p. 1153]; *People* v. *Ellis, supra,* 65 Cal.2d at p. 533), the distinction is legally valid.

█ The purpose of the Fifth Amendment is not, after all, to prevent criminals from being convicted. It merely seeks to avoid that they convict themselves out of their own mouths, unless they do so voluntarily, aware of their rights, knowing that they do not have to. The *Varnum* situation is a classic instance of communicative self-incrimination: by revealing the hiding place of the gun, the speaker also revealed her knowledge of its presence. Nothing of the sort would have been the case if she had merely granted permission to search a place where it was eventually found.

Needless to say, the result we have reached depends on the correctness of the decisions which hold that a valid consent need not be preceded by an express explanation of the right to refuse. (See fn. 1, *ante.*) If, ultimately, those cases are held to be unsound, we would not even reach the question we have been discussing. However, since those cases are presently the law in California we add this thought in support of our result: to hold that where the consenter is in custody, the consent is invalid unless there has been compliance with *Miranda,* would effectively pull the rug out from under the rule that no advice of Fourth Amendment rights need be given. If the consent to search is interpreted as a testimonial communication, then the duty to advise

a suspect in custody of his right to remain silent, necessarily includes a duty to advise him of his privilege not to react in any fashion to the request for permission to search. It is thus perceived that the point made by defendant in this case is really nothing but a sophisticated rearrangement of the issue decided adversely in the cases beginning with *People* v. *Roberts,* 246 Cal. App.2d 715, 728-729 [55 Cal.Rptr. 62].

*Refusal to Order Revelation of the*
*Informers' Identities*

We assume without deciding that, as the case developed, the defense being what it was, the defendant at some time, upon a proper showing, would have been entitled to learn the names of the persons who apparently had been in his apartment and who might have corroborated his story with respect to Thelma's presence. They possibly could have lent some credence to his claim that it was she and not he who was involved with narcotics. There is a similarity between the facts of this case and *People* v. *Garcia,* 67 Cal.2d 830, 835-841 [64 Cal.Rptr. 110, 434 P.2d 366]. (See also *Honore* v. *Superior Court,* 70 Cal.2d 162 [74 Cal.Rptr. 233, 449 P.2d 169].) ▮ We do not believe, however, that the present record justifies a holding that the lower court committed any error.[5] At the preliminary hearing, at the 1538.5 motion and at the trial, defendant was represented by the same, extremely able counsel. We have noted that the last occasion on which there was any mention of identification of the informers was the preliminary hearing. Certainly it was no error to refuse the request at that time. Although hindsight may tell us that when counsel mentioned that the informers might throw some light on the question whether it was the defendant "or some other person" who put narcotics behind the ironing board, counsel was thinking of the defense built around Thelma, the magistrate was not taken into his confidence. As far as he was concerned defendant had not demonstrated "a reasonable possibility that the anonymous informant[s] whose identity [was] sought could give evidence on the issue of guilt which might result in defendant's exoneration." (*People* v. *Garcia, supra,* 67 Cal.2d at p. 840.) The

---

[5]We express no view of the effect of an erroneous ruling by the magistrate on the judgment of conviction in the superior court. (Cf. *Mitchell* v. *Superior Court,* 50 Cal.2d 827 [330 P.2d 48].) We have noted that a motion to dismiss under section 995 of the Penal Code was made. (*People* v. *Scoma,* 71 Cal.2d 332, 335 [78 Cal.Rptr. 491, 455 P.2d 419]; *Priestly* v. *Superior Court,* 50 Cal.2d 812, 815 [330 P.2d 39].) The record, however, does not indicate whether the magistrate's denial of discovery was urged at the superior court level. (Cf. *Mesaris* v. *Superior Court,* 4 Cal.App.3d 976 [85 Cal.Rptr. 124].)

demonstration of such a possibility requires more than speculation. (*People* v. *Sewell,* 3 Cal.App.3d 1035, 1039 [83 Cal.Rptr. 895]; *People* v. *Martin,* 2 Cal.App.3d 121, 127 [82 Cal.Rptr. 414].)

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.

A petition for a rehearing was denied December 2, 1970, and appellant's petition for a hearing by the Supreme Court was denied January 21, 1971. Peters, J., was of the opinion that the petition should be granted.