[Crim. No. 19271. Mar. 15, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMUEL P. JAMES, Defendant and Appellant.

**Counsel**

Samuel P. James, in pro. per., Michael A. Kahn, under appointment by the Supreme Court, and Seymour I. Cohen, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Russell Iungerich, Edward T. Fogel, Jr., and Carol Wendelin Pollack, Deputy Attorneys General, for Plaintiff and Respondent.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim and George M. Palmer, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant appeals from a judgment convicting him of two counts of first degree burglary, one count of second degree burglary, and one count of armed robbery.

At 1:10 a.m. on Friday, September 6, 1974, Verta Kirk began her nightly work as cleaning woman in a small office building in Los Angeles. Ten minutes later she came upon defendant in the second-floor hallway. He ordered her to "freeze," but she retreated into the adjacent office of Congressman Hawkins and slammed the door, automatically locking it. Defendant kicked the door open, seized Mrs. Kirk, pressed a knife blade against her chest, and announced he had to kill her because she could identify him. She pretended to faint. He went through her pockets and took some 30 dollars and her driver's license from her wallet. He then threw water on her, and she pretended to revive. She told him she had a bad heart and asked him to leave, but he again said he would have to kill her.

Mrs. Kirk engaged defendant in conversation for approximately 45 minutes. Throughout this period she had ample opportunity to observe his features and appearance, as she was never more than two feet from him and the room in which they were talking was well lit. Finally defendant asked her how to get out of the building, and she said she would unlock the front door for him. As they were leaving, defendant entered another office, occupied by the Children's Television Workshop, and carried out a television set and a jacket. He discarded his knife into a nearby trash can, but told Mrs. Kirk he had a gun in his pocket and would shoot her if she tried to run. She saw "something he was holding on me," but could not identify the weapon.

After they reached the street defendant signaled a passing car and it stopped at the curb. When he began talking with its occupants, Mrs. Kirk ran away. Defendant jumped into the car with the television set, and the car drove off.

Summoned promptly to the scene, police officers found the knife discarded by defendant; it was revealed to be a letter opener stolen from a third office in the building, occupied by Project SEED.[1] In addition, a checkbook belonging to that organization was found lying in the Children's Television Workshop. In the latter office the screen on a skylight leading to the roof had been either cut or torn, and there was a large amount of dirt on the carpet beneath. Access to the quarters of Project SEED had apparently been gained by breaking the molding of the door, and desk drawers in that office had been ransacked.

Los Angeles Police Officer Turner was assigned the investigation of the case. From other detectives he obtained the name of an individual who used a similar modus operandi, and prepared a "mug shot lineup" of photographs of that person and five or six other men of similar appearance. A photograph of defendant James happened to be included. On Monday, September 9, 1974, Mrs. Kirk looked at the photographs, and picked out defendant as her assailant. To verify the identification Officer Turner showed Mrs. Kirk six additional photographs which were larger and clearer, and she again picked out defendant.[2]

Defendant was arrested at his house on the following evening, and the stolen television set was found on his premises. The set was seized, and photographs of it were identified at trial by employees of the workshop.

After his arrest defendant gave the following version of the events to Officer Turner: On the night in question he had been walking in the vicinity of the building where the crimes were committed. He stopped a car and asked for a ride home. The driver agreed to do so for $1.50, but said, "First I want to rip off this building where I work." Defendant went to the front door of the building, and entered when someone opened it from the inside. He admitted following Mrs. Kirk into Congressman Hawkins' office and seeing her faint, but denied taking her money. He stated that he picked up the letter opener and held it in his hand while he told Mrs. Kirk not to call the police, but denied touching her with it.

---

[1]SEED is an acronym for Special Elementary Education for the Disadvantaged.

[2]At trial Mrs. Kirk positively identified defendant in person, adding, "I'll never forget him."

Finally, he admitted taking the television set and departing with it in the car.[3]

Defendant first contends the evidence of the stolen television set in his house was obtained by an illegal search and seizure. Our guiding principles are well settled. ■ Inasmuch as the search herein was conducted without a warrant, the burden was on the People to establish justification under a recognized exception to the warrant requirement. (*People* v. *Rios* (1976) 16 Cal.3d 351, 355-356 [128 Cal.Rptr. 5, 546 P.2d 293].) ■ The People relied on consent, which constitutes such an exception. (*People* v. *Michael* (1955) 45 Cal.2d 751, 753 [290 P.2d 852].) In that event, however, the People had the additional burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. (*People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].)[4] The voluntariness of the consent is in every case "a question of fact to be determined in the light of all the circumstances." (*People* v. *Michael, supra,* 45 Cal.2d at p. 753; accord, *People* v. *Reyes* (1974) 12 Cal.3d 486, 501 [116 Cal.Rptr. 217, 526 P.2d 225].)

■ The People introduced the following evidence on this issue at the hearing on defendant's motion to suppress: After Mrs. Kirk identified defendant as her assailant, Officer Turner obtained his current address and requested Officer Ferraro to effectuate the arrest. The latter was given a photograph of defendant, and was advised that a handgun had been used in the robbery and a television set had been stolen from the Children's Television Workshop. At 10 p.m. on September 10, 1974, Officer Ferraro and three other policemen went to defendant's house. Officer Ferraro knocked on the door; defendant answered, and the officer recognized him from his photograph. Officer Ferraro testified he

---

[3]At trial defendant changed his story and testified he never went to the building where the crimes were committed, but spent the night in question at home. He further claimed that the television set had been in his possession since September 1, 1974, when the woman he was living with "bought it from some guy" while shopping for groceries.

[4]The People may discharge the foregoing burdens by a preponderance of the evidence. (*United States* v. *Matlock* (1974) 415 U.S. 164, 177-178, fn. 14 [39 L.Ed.2d 242, 253-254, 94 S.Ct. 988]; cf. *People* v. *Superior Court (Bowman)* (1971) 18 Cal.App.3d 316, 321 [95 Cal.Rptr. 757] (probable cause to conduct pat-down search).) Our reference in *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 274 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], to the People's burden of showing "clear and positive" evidence of consent was simply meant to emphasize the importance and distinctiveness of that burden; it was not intended to adopt the special standard of "clear and convincing proof" (Evid. Code, § 115). To the extent it holds to the contrary, *People* v. *Reynolds* (1976) 55 Cal.App.3d 357, 367 [127 Cal.Rptr. 561], is disapproved.

then directed defendant to step outside and down the front stairs. After giving his name, defendant was placed under arrest and handcuffed. Officer Ferraro told defendant that he was conducting a robbery investigation, and asked if he could look in the house for items taken. Defendant appeared to have no difficulty understanding the request, and answered "Yes" or "Yeah." As soon as the officer stepped through the front door he saw the missing television set, bearing an identification tag in the name of the Children's Television Workshop.

Defendant gave a different version of these events; in particular, he testified that Officer Ferraro neither asked for nor received his permission to enter the house. But the trial court, by denying the motion to suppress, impliedly found that the officer's testimony was true and that defendant voluntarily consented to the search. (Evid. Code, § 402, subd. (c); *People* v. *West* (1970) 3 Cal.3d 595, 602 [91 Cal.Rptr. 385, 477 P.2d 409].)

■ Our role in reviewing the resolution of this issue is limited. The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, "The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence." (*People* v. *Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585]; accord, *People* v. *Ruster* (1976) 16 Cal.3d 690, 701 [129 Cal.Rptr. 153, 548 P.2d 353].)

Defendant contends that the foregoing testimony of Officer Ferraro, even if true, does not constitute substantial evidence to support the implied finding of voluntariness because it was assertedly undermined by six additional facts shown in the record. We conclude that in the circumstances of this case the matters relied on by defendant neither singly nor in combination require a finding of coercion as a matter of law.

■ To begin with, defendant stresses that at the time of giving consent he was both under arrest and in handcuffs. He cites three California cases as authority for the relevance of these facts: *Castaneda* v. *Superior Court* (1963) 59 Cal.2d 439, 443 [30 Cal.Rptr. 1, 380 P.2d 641], *People* v. *Shelton* (1964) 60 Cal.2d 740, 745 [36 Cal.Rptr. 433, 388 P.2d 665], and *People* v.

*Wilson* (1956) 145 Cal.App.2d 1, 7 [301 P.2d 974]. The cases are not controlling, however, because each involved additional significant circumstances which are not here present. Thus in *Castaneda* the defendant was arrested and placed in handcuffs at a house some distance from his own. Although he purported to give the officers permission to search his house, he thereafter led them on a classic wild goose chase.[5] We overturned a finding of consent, reasoning (at p. 443) that defendant "repeatedly attempted to lead the officers away from his home, and after these efforts failed, he was neither asked to nor did he express his consent that the search continue. These efforts make abundantly clear that petitioner did not freely and voluntarily consent to the search of his home."

Similarly, in *Shelton* the defendant was arrested some distance from his apartment and purported to agree to its search. The officers took him to the apartment and knocked on the door. A woman inside asked who it was; the officers requested the defendant to answer that it was he, but the defendant refused to do so. The police then gained admittance by an assertion of authority. We rejected the prosecution's claim of consent to search, stating (at p. 745 of 60 Cal.2d) that the fact that the defendant was under arrest and "his subsequent refusal to assist the officers in gaining access to the apartment established that his apparent consent was not voluntarily given," citing inter alia *Castaneda* v. *Superior Court*.[6] In the case at bar defendant made no such attempt to mislead or deceive Officer Ferraro.

---

[5]The officers asked the defendant where he lived, and he began by giving a false address. When they inquired if he was sure of that information, he took them to his true address. Even then, however, he sought to divert the police by insisting that he lived next door, i.e., at his aunt's house. When the police went to that house and asked his aunt if he lived there, he twice warned her, "Mary, don't tell them nothing." The defendant next claimed that he kept his narcotics at yet another location—his mother's house—on a rafter in the garage. The officers went to that house as well, but found nothing. Finally they returned to the defendant's house and uncovered the narcotics in a search of the premises.

[6]Other cases are in accord. Thus in *People* v. *Faris* (1965) 63 Cal.2d 541 [47 Cal.Rptr. 370, 407 P.2d 282], the defendant's cotenant was apprehended by the police in the act of committing a burglary, and we may safely assume he was placed under arrest and handcuffed. He purported to consent to a search of his apartment, but sent the police to an address from which he had moved two or three months earlier. We concluded (at p. 545) that "His attempt to mislead the officers with a false address clearly demonstrates that he did not consent to a search" of his true address.

Again, in *People* v. *Currier* (1965) 232 Cal.App.2d 103 [42 Cal.Rptr. 562], the defendant was arrested and handcuffed some 250 feet from the hotel where he lived. He first denied living there, but admitted the contrary when the landlady told the police that he was in fact a tenant. The officers then asked the defendant if they could search the premises; he purported to consent, but falsely stated he had no key to his room. In

Defendant's reliance on *People* v. *Wilson* (1956) *supra,* 145 Cal.App.2d 1, is no less misplaced, but for a different reason. In that case the defendant was arrested and searched on a charge of "vagrancy." Immediately thereafter he purported to consent to a search of his automobile, which disclosed betting slips. The Court of Appeal concluded from the record that the vagrancy arrest was a mere subterfuge disguising a police effort to find evidence of bookmaking, and was illegal for lack of probable cause. ■ Holding the car search unlawful, the court reasoned (at p. 7) that "it is obvious that a 'permission' granted after a person has been improperly arrested and searched, while he is still in custody, and without informing him of his legal right to refuse permission, is not a real or proper consent."

■ It is well settled that the first of the three facts relied on in *Wilson*—i.e., that the consent to search was induced by an illegal arrest—compels, even standing alone, a conclusion of involuntariness: "The rule is clearly established that consent induced by an illegal search or arrest is not voluntary, and that if the accused consents immediately following an illegal entry or search, his assent is not voluntary because it is inseparable from the unlawful conduct of the officers." (*Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 251 [118 Cal.Rptr. 166, 529 P.2d 590], and cases cited; accord, *People* v. *Leib* (1976) 16 Cal.3d 869, 877 [129 Cal.Rptr. 433, 548 P.2d 1105].) ■ In the case at bar, however, defendant's arrest was predicated on ample probable cause—his identification by the eyewitness victim, Mrs. Kirk.[7]

In the absence of such illegality, it is established that the defendant's custody at the time of giving consent to search is a circumstance which is of "particular significance" but is "not conclusive" in the determination of voluntariness. (*Castaneda* v. *Superior Court* (1963) *supra,* 59 Cal.2d 439, 443.) ■ "It cannot be said as a matter of law that consent given by a defendant is involuntary because it is given while he is under

---

concluding that the defendant did not actually consent to the search the Court of Appeal gave equal weight to the foregoing two efforts at deception, the fact of the defendant's custody, and other conduct of the police. (*Id.,* at p. 110.)

For the point under consideration, as well as other contentions raised hereinafter, defendant also cites search and seizure decisions of the lower federal courts and of our sister states. We have examined the cases referred to and find no significant differences between their holdings and the California rules discussed herein. (See generally Annot., 9 A.L.R.3d 858.)

[7]Defendant's claim that his arrest was unlawful because the police assertedly had time to obtain a warrant was refuted in *United States* v. *Watson* (1976) 423 U.S. 411, 416-424 [46 L.Ed.2d 598, 604-609, 96 S.Ct. 820].

arrest." (*People* v. *Fischer* (1957) 49 Cal.2d 442, 448 [317 P.2d 967].) Rather, the fact is to be weighed in the balance together with all other circumstances bearing on this issue. (*People* v. *Smith* (1966) 63 Cal.2d 779, 798 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116].) ▮ And the same rule governs when the defendant has been handcuffed: "the fact that a defendant is under arrest and in handcuffs at the time of giving consent does not *per se* make a consent to a search involuntary. It is but one of the factors, but not the only one, to be considered by the trial judge who sees and hears the witnesses and is best able to pass upon the matter." (*People* v. *Valdez* (1961) 188 Cal.App.2d 750, 756 [10 Cal.Rptr. 664].)[8]

▮ As additional evidence of coercive circumstances defendant emphasizes the following facts: it was 10 p.m. when the officers appeared at his door; they did not announce they were policemen; they directed him to come out of his house; and when his consent to search was sought, he was standing alone with three armed officers around him.[9] Defendant contends these facts show that his consent was a mere submission to authority because he was "under the total domination and control of the police" who had "acted dramatically and forcefully" when they took him into custody.

The California cases which have invalidated findings of consent on this ground, however, have either involved far more coercive circumstances or additional facts such as an illegal arrest or a false claim of authority to search. Thus in *People* v. *McKelvy* (1972) 23 Cal.App.3d 1027 [100 Cal.Rptr. 661], four armed officers in a patrol car stopped the defendant because they deemed it "peculiar" that he was walking across front lawns at 3 a.m. in a residential area. They turned their spotlight on him and saw him put a small dark object in his pocket. While one officer approached the defendant with a shotgun, "the other three officers, each

---

[8]Applying this rule, courts have upheld, in varying circumstances, findings of consent to search given by defendants who were both under arrest and in handcuffs at the time. (See, e.g., *People* v. *Smith* (1966) *supra*, 63 Cal.2d 779, 798-799; *People* v. *Ward* (1972) 27 Cal.App.3d 218, 224-225 [103 Cal.Rptr. 671]; *People* v. *Brown* (1971) 19 Cal.App.3d 1013, 1017-1018 [97 Cal.Rptr. 341]; *People* v. *Campuzano* (1967) 254 Cal.App.2d 52, 57-58 [61 Cal.Rptr. 695]; *People* v. *Valdez, supra*; *People* v. *Rodriguez* (1959) 168 Cal.App.2d 452, 457 [336 P.2d 266]; *People* v. *Lujan* (1956) 141 Cal.App.2d 143, 147-148 [296 P.2d 93].)

[9]Officer Ferraro testified he was in uniform, but he was not asked if he was armed. We may reasonably infer the latter fact, as a sidearm is among the customary equipment of a police officer who is on duty and in uniform. Of course, the fact that Officer Ferraro was in uniform also diminishes the relevance of the claim that he did not specifically inform defendant he was a policeman: we may likewise reasonably infer that defendant could tell from Ferraro's uniform that he was dealing with an officer of the law.

carrying either a shotgun or carbine, moved 'into position' to cover the police unit and each other." (*Id.,* at p. 1032.) After the defendant explained that he was going home, the officer asked him to hand over the object in his pocket. He complied, and it proved to be a small bottle of a restricted dangerous drug. In light of these facts the Court of Appeal rejected an implied finding of voluntary consent to search, reasoning (at p. 1034) that "defendant was standing in a police spotlight, surrounded by four officers all armed with shotguns or carbines. In these circumstances no matter how politely the officer may have phrased his request for the object, it is apparent that defendant's compliance was in fact under compulsion of a direct command by the officer."

Again, in *Stern* v. *Superior Court* (1971) 18 Cal.App.3d 26 [95 Cal.Rptr. 541], two officers on patrol observed the defendant and two companions standing near a parked car at 10:45 p.m. The officers approached the young men with drawn guns, ordered them up against the car, and conducted a pat-down search. Finding a substantial amount of cash on one of the men, an officer stood guard over them while his partner examined a nearby residence for signs of burglary. After some minutes he returned and placed the men under arrest for that crime, then asked the defendant if he could search the parked car. The defendant gave him the keys, and marijuana was discovered in the trunk.

Granting a writ of prohibition to restrain the prosecution, the Court of Appeal held that the arrest lacked probable cause and the defendant's purported consent to search was in fact a submission to the officers' show of force. The court explained (at p. 30) that the defendant "was under arrest at the time and he had been held at gunpoint for some time while an adjacent home was vainly searched for clues of a nonexistent burglary. Consent secured at gunpoint following an illegal arrest cannot be relied upon to render the evidence obtained by a search and seizure pursuant thereto admissible."[10]

In a related group of cases the assertion of police authority was essentially verbal but no less coercive, in that the request for permission to search was accompanied by a claim of the right to proceed regardless

[10]Physical domination of the defendant need not take the form of display of weapons: apparent consent to search has been held involuntary when it has followed, for example, a protracted period of incarceration (*People* v. *Leib* (1976) *supra,* 16 Cal.3d 869, 877), detention (see *People* v. *Superior Court (Casebeer)* (1969) 71 Cal.2d 265, 270 [78 Cal.Rptr. 210, 455 P.2d 146]), or custodial interrogation (*United States* v. *Rothman* (9th Cir. 1973) 492 F.2d 1260, 1264-1265; *Judd* v. *United States* (D.C. Cir. 1951) 190 F.2d 649, 651-652 [89 App.D.C. 64]).

of consent. For example, in *People* v. *Brown* (1975) 53 Cal.App.3d Supp. 1 [125 Cal.Rptr. 739], three members of the vice squad sought to inspect a private steam bath establishment. One of the officers identified himself and asked to be admitted. When the ticket-seller began reading a statement prepared for that eventuality, the officer claimed that because he was a policeman he had the right to go inside and check the permit. After reiterating this assertion he was allowed to enter.

Holding that the purported consent was the product of coercion, the appellate department noted that five days earlier the same officers had likewise been refused admittance but had nevertheless entered after they "liberated the door from its hinges"—an event which, the court surmised, conveyed "the clear message that the officers would not accept and peacefully depart if admittance were denied them." (*Id.,* at p. 5.) Reviewing the facts, the court concluded (at pp. 5-6), "where it appears from the officer's own testimony that he ordered the door opened when he had no right to do so and the circumstances clearly indicate that the attendant complied with the order because he believed resistance would be futile, the question becomes one of law, and the lower court's determination that admittance was freely and voluntarily given cannot stand." (Accord, *People* v. *Shelton* (1964) *supra,* 60 Cal.2d 740, 746, and cases cited.)

The same result follows when the claim of a right to search is made indirectly, suggesting to the suspect that it would be unwise or fruitless to resist. Thus an apparent consent has been deemed involuntary when given in response to "covert threats of official sanction" (*Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260, 268-270 [57 Cal.Rptr. 623, 425 P.2d 223], and cases cited) or an officer's false claim or implication that he was in possession of a search warrant for the premises (*Lane* v. *Superior Court* (1969) 271 Cal.App.2d 821, 825-826 [76 Cal.Rptr. 895]; *Bumper* v. *North Carolina* (1968) 391 U.S. 543, 550 [20 L.Ed.2d 797, 803, 88 S.Ct. 1788]). As the United States Supreme Court observed in the latter case (*ibid.*), "When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search."[11]

---

[11]In the latter context it is the element of deception which negates the voluntariness of the consent. That deception appears, for example, when the officer falsely claims he either has or can obtain a warrant to search the premises. But the rule is otherwise if the officer actually has probable cause to obtain a warrant and merely advises the defendant of the fact. Thus in *People* v. *Ruster* (1976) *supra,* 16 Cal.3d 690, 699-701, we distinguished *Bumper* and upheld a trial court's finding of consent when the officer did not claim he already had a warrant entitling him to search the defendant's car, but

In the case at bar the arresting officer neither held defendant at gunpoint, nor unduly detained or interrogated him; the officer did not claim the right to search without permission, nor act as if he intended to enter regardless of defendant's answer. Whether in some other setting the conduct of Officer Ferraro might be deemed coercive is not the issue before us; rather, the precautions he took must be viewed in the light of his assignment on the evening in question, i.e., to apprehend a man who was suspected of armed robbery and burglary and was reportedly in possession of a handgun. (Compare *People* v. *Dahlke* (1967) 257 Cal.App.2d 82, 88 [64 Cal.Rptr. 599].) "Under these circumstances, to hold as a matter of law that the evidence was produced in response to an unlawful assertion of authority would seriously hamper officers in the reasonable performance of their duties." (*People* v. *Michael* (1955) *supra,* 45 Cal.2d 751, 754.)

The remaining three factors stressed by defendant do not relate directly to voluntariness in the traditional sense. He first contends that his expression of consent was inadequate because it consisted only of the single word "Yes" or "Yeah." But there is no talismanic phrase which must be uttered by a suspect in order to authorize a search. The request which Officer Ferraro put to defendant was clear and simple, and the affirmative response of the latter was far less equivocal than many which have been found to evidence consent. (See, e.g., *People* v. *Carrillo* (1966) 64 Cal.2d 387, 393 [50 Cal.Rptr. 185, 412 P.2d 377] (defendant's ex-wife consented to search by saying "go ahead" and "she didn't care"); *People* v. *Perillo* (1969) 275 Cal.App.2d 778, 782 [80 Cal.Rptr. 160] ("I don't care"); *People* v. *Dahlke* (1967) *supra,* 257 Cal.App.2d 82, 86 ("Do what you want").) Indeed, no words at all need be spoken: in appropriate circumstances, consent to enter may be unmistakably manifested by a gesture alone. (*People* v. *Harrington* (1970) 2 Cal.3d 991, 995 [88 Cal.Rptr. 161, 471 P.2d 961]; *People* v. *Linke* (1968) 265 Cal.App.2d 297, 313 [71 Cal.Rptr. 371], and cases cited.)

Defendant next asserts there was "no rational or logical reason" for him to agree to the search because he knew it would disclose incriminating evidence, i.e., the stolen television set. This point has occasionally been noted in our cases (see, e.g., *People* v. *Faris* (1965) *supra,* 63 Cal.2d

---

simply informed the defendant that he intended to impound the vehicle and then obtain such authorization. We noted that the officer also advised the defendant he did not have to consent to an immediate search and could demand a warrant, and that any incriminating evidence found in a consent search could be used against him. (See also *People* v. *McClure* (1974) 39 Cal.App.3d 64, 69-70 [113 Cal.Rptr. 815], and cases cited.)

541, 545); but in none has it been held dispositive, for the obvious reason that to do so would nullify virtually every consent search which turns up incriminating evidence. Contrary to defendant's implication, there may be a number of "rational reasons" for a suspect to consent to a search even though he knows the premises contain evidence that can be used against him: for example, he may wish to appear cooperative in order to throw the police off the scent or at least to lull them into conducting a superficial search; he may believe the evidence is of such a nature or in such a location that it is likely to be overlooked; he may be persuaded that if the evidence is nevertheless discovered he will be successful in explaining its presence or denying any knowledge of it; he may intend to lay the groundwork for ingratiating himself with the prosecuting authorities or the courts; or he may simply be convinced that the game is up and further dissembling is futile. Whether these or any other reasons motivated defendant in the case at bar was at most a matter for the trial court to consider in weighing this factor with all the others bearing on the issue of voluntariness.

■ Finally, defendant relies on the fact that prior to soliciting permission to search, Officer Ferraro did not advise him either of his right to refuse consent or of his rights under the rule of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and its California progeny. Defendant not only urges that the absence of such warnings compels a finding of coercion under the totality of the circumstances test; he broadens the attack, and contends that regardless of the outcome of the foregoing analysis no consent should be held "voluntary" unless the police officer actually gave both warnings before asking permission to search. Under our cases, however, neither warning is mandatory.

We begin by briefly disposing of defendant's contention that his consent was presumptively tainted because Officer Ferraro had not given him a *Miranda* warning. On that point the leading case is *People* v. *Thomas* (1970) 12 Cal.App.3d 1102, 1108-1112 [91 Cal.Rptr. 867], which held that advice as to *Miranda* rights is not a prerequisite to a voluntary consent to search. The rationale of *Thomas* was that such consent is "neither testimonial, nor communicative in the Fifth Amendment sense. If appearing in a lineup and speaking words used by a robber is not a 'disclosure of any knowledge [the accused] might have' (*United States* v. *Wade*, 388 U.S. 218, 222 [18 L.Ed.2d 1149, 1155, 87 S.Ct. 1926]), neither is a consent to search. The fact that the search leads to incriminating evidence does not make the consent testimonial, any more than the

victim's identification at the lineup gives such a quality to the words spoken by the suspect." (*Id.,* at p. 1110.) In short, "The request for a consent to search is designed to elicit physical and not testimonial evidence." (*People* v. *Strawder* (1973) 34 Cal.App.3d 370, 379 [108 Cal.Rptr. 901].)[12]

We expressly adopted the *Thomas* rationale in *People* v. *Ruster* (1976) *supra,* 16 Cal.3d 690, 700. The context was somewhat different, as we there determined that *Miranda* was not violated when an officer asked for and obtained consent to search after the defendant had exercised his privilege against self-incrimination. We now invoke the *Thomas* rationale for its original conclusion: for the reasons stated in that decision, we hold that defendant's consent was not rendered involuntary as a matter of law because Officer Ferraro did not advise him of his *Miranda* rights before asking permission to search.[13] We find no such obligation under either the California or federal Constitutions, and we reject as unpersuasive defendant's proposed distinction in this connection between custodial and noncustodial requests. Inasmuch as the request to search is not intended to produce testimonial evidence, the setting in which it is made is irrelevant to this issue.

 There is no greater merit in defendant's complaint that he was not expressly told he could deny the officers the right to enter. In a long line of decisions beginning at least a decade ago (*People* v. *Roberts* (1966) 246 Cal.App.2d 715, 728-729 [55 Cal.Rptr. 62]), the Courts of Appeal developed the rule that a warning of the right to refuse permission to search is not a precondition to a valid consent. (See, e.g., *Carlson* v. *Superior Court* (1976) 58 Cal.App.3d 13, 19 [129 Cal.Rptr. 650]; *People* v. *Strawder* (1973) *supra,* 34 Cal.App.3d 370, 377; *People* v. *De Strulle* (1972) *supra,* 28 Cal.App.3d 477, 482; *People* v. *Tremayne* (1971) 20 Cal.App.3d 1006, 1014 [98 Cal.Rptr. 193]; *People* v. *Hidalgo* (1970) 7 Cal.App.3d 525, 529 [86 Cal.Rptr. 660]; *People* v. *Stark* (1969) 275

---

[12]The Courts of Appeal have consistently followed *Thomas* on this issue. (See, e.g., *People* v. *De Strulle* (1972) 28 Cal.App.3d 477, 482 [104 Cal.Rptr. 639]; *People* v. *Strawder* (1973) *supra,* 34 Cal.App.3d 370, 379-380; *People* v. *McClure* (1974) *supra,* 39 Cal.App.3d 64, 70; for an earlier holding to the same effect, see *People* v. *Dahlke* (1967) *supra,* 257 Cal.App.2d 82, 87.)

Not only is an expression of consent to search not a testimonial act, but the intent of the person giving it may well be the converse of self-incrimination. As we explained in our discussion of defendant's claim that there was no "rational reason" for him to consent, such permission may be motivated by a variety of self-exculpatory tactics. (See, e.g., *People* v. *Castaneda* (1976) 58 Cal.App.3d 165, 168-169, 171 [129 Cal.Rptr. 755].)

[13]Officer Turner gave defendant *Miranda* advice prior to questioning him on the morning after his arrest.

Cal.App.2d 712, 714-715 [80 Cal.Rptr. 307]; *People* v. *Beal* (1968) 268 Cal.App.2d 481, 484-485 [73 Cal.Rptr. 787], and cases cited.) The reason for the rule, as stated in numerous Court of Appeal opinions, is that "The mere asking of permission to enter and make a search carries with it the implication that the person can withhold permission for such an entry or search." (*People* v. *Chaddock* (1967) 249 Cal.App.2d 483, 485-486 [57 Cal.Rptr. 582]; accord, *People* v. *Bustamonte* (1969) 270 Cal.App.2d 648, 653 [76 Cal.Rptr. 17]; *People* v. *Cirilli* (1968) 265 Cal.App.2d 607, 610 [71 Cal.Rptr. 604]; *People* v. *Slade* (1968) 264 Cal.App.2d 188, 190 [70 Cal.Rptr. 321]; *People* v. *MacIntosh* (1968) 264 Cal.App.2d 701, 705-706 [70 Cal.Rptr. 667]; *People* v. *De Leon* (1968) 263 Cal.App.2d 155, 156 [69 Cal.Rptr. 653].)

Defendant denigrates this rationale as a "legal fiction," but we believe it to be psychologically sound: when a person of normal intelligence is expressly asked to give his consent to a search of his premises, he will reasonably infer he has the option of withholding that consent if he chooses.[14] Defendant further contends that the reasoning "does not apply" to requests made of persons who are in custody. But he cites no authority directly supporting this assertion, and in any event it is inconsistent with common human experience: while the fact of arrest or custody is relevant to determining whether the suspect has the *will* to refuse consent, it is irrelevant to whether he has the *knowledge* of his right to do so. That knowledge is imparted by the request itself. Indeed, in a number of the Court of Appeal cases holding that a warning of the right to refuse is not a precondition to a consent search, the person whose permission was sought was under arrest and in police custody at the time. (See, e.g., *People* v. *Strawder* (1973) *supra,* 34 Cal.App.3d 370, 377; *People* v. *Ramos* (1972) 25 Cal.App.3d 529, 535 [101 Cal.Rptr. 230]; *People* v. *Richardson* (1968) 258 Cal.App.2d 23, 31 [65 Cal.Rptr. 487]; *People* v. *Baker* (1968) 267 Cal.App.2d 916, 918 [73 Cal.Rptr. 455]; *People* v. *Braden* (1968) 267 Cal.App.2d 939, 942 [73 Cal.Rptr. 613].)[15]

Both this court and the United States Supreme Court have adopted the rule thus developed in our Courts of Appeal. We did so in *People* v. *Duren* (1973) 9 Cal.3d 218, 241 [107 Cal.Rptr. 157, 507 P.2d 1365], stating that "California does not require a police warning as a prior condition

---

[14]If for any reason his mental facilities are less than normal at the time, of course, that will be a factor to be accorded appropriate weight in appraising the totality of the circumstances.

[15]In the last two cases cited the court specifically invoked the reasoning here challenged, i.e., the fact of the request implied the right to refuse.

for a valid consent to search." In the following year we reaffirmed the rule. (*People* v. *Reyes* (1974) *supra,* 12 Cal.3d 486, 501.) The United States Supreme Court adopted the California view in *Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 227-234 [36 L.Ed.2d 854, 862-867, 93 S.Ct. 2041], and recently extended it to the case of a defendant who is in police custody at the time his consent to search is requested. (*United States* v. *Watson* (1976) *supra,* 423 U.S. 411, 424-425 [46 L.Ed.2d 598, 609-610].) Neither *Duren* nor *Reyes* presented a custody situation, but for the reasons given above we agree with *Watson* that the same rule should apply.

Defendant contends the California rule is inconsistent with language in *Blair* v. *Pitchess* (1971) *supra,* 5 Cal.3d 258, 274, and *People* v. *Myers* (1972) 6 Cal.3d 811, 818-819 [100 Cal.Rptr. 612, 494 P.2d 684], to the effect that consent to search is a "waiver" which must therefore be shown to have been "knowledgeably" or "knowingly" made. The language relied on, however, must be read in the context of the facts and holding of each case. *Blair* confronted the California claim and delivery law, whereby the plaintiff in a civil action to recover personal property could, upon filing an undertaking, require the sheriff to enter the defendant's premises and seize the property by service of written process. We held that such intrusions constituted unreasonable searches and seizures in violation of the constitutional guarantees, and rejected a defense of consent. Permission given after a demand for admittance made by a sheriff under color of legal process, we reasoned, constitutes mere submission to authority. (*Id.,* at pp. 274-275.) Accordingly, *Blair* is in essence a further example of the above-discussed line of cases applying the rule that an apparent consent in response to an official claim of authority will be deemed coerced.[16]

*Myers* is similarly distinguishable. There, police and a parole officer found contraband during a warrantless search of premises rented by a narcotic addict outpatient at a time when the latter was not home. We held the search could not be justified merely by the defendant's status, and that no statute or regulation then in force compelled him to consent to such an intrusion as a precondition to release as an outpatient. (6 Cal.3d at pp. 818-819.) There was thus not even an apparent consent by the defendant, and we did not need to reach the question of whether an administrative requirement of such a consent or "waiver" would be

---

[16]*Blair's* parentage to those cases is demonstrated by our citation therein (at p. 275) to *Bumper* v. *North Carolina* (1968) *supra,* 391 U.S. 543, 548-550 [20 L.Ed.2d 797, 802-803], and *Parrish* v. *Civil Service Commission* (1967) *supra,* 66 Cal.2d 260, 268-270.

invalid because not reasonably related to the purposes of the civil commitment statute. (See *id.,* at pp. 816-818.)[17]

While we reject an absolute requirement of a warning of the right to refuse permission as a precondition to a consent search, we do not intend to discourage the giving of such advice in appropriate cases. In view of the settled rule that the lack of such a warning is a factor to be taken into account in applying the totality of the circumstances test (*Schneckloth* v. *Bustamonte* (1973) *supra,* 412 U.S. 218, 227, 249 [36 L.Ed.2d 854, 862-863, 875]; *People* v. *Superior Court (Casebeer)* (1969) *supra,* 71 Cal.2d 265, 270, fn. 7; *People* v. *Strawder* (1973) *supra,* 34 Cal.App.3d 370, 377; *People* v. *Ramos* (1972) *supra,* 25 Cal.App.3d 529, 536), the police would be well advised in close cases to "make a record" by expressly giving the admonition rather than relying on the inference discussed hereinabove.[18]

Turning to the facts of the case at bar, we note, as did the United States Supreme Court in *United States* v. *Watson* (1976) *supra,* 423 U.S. 411, 424-425 and footnote 14 [46 L.Ed.2d 598, 609-610], that defendant was not "a newcomer to the law." The record showed that Officer Turner had arrested defendant on two previous occasions—once three or four months earlier and once during the preceding year. Under all circumstances of this case, the trial court was not required as a matter of law to find that defendant remained ignorant of his right to refuse permission to search.

We conclude that the record contains substantial evidence to support the implied finding of voluntary consent, and hence that finding is binding on appeal. It follows that the evidence of the stolen television set in defendant's house was not obtained by an illegal search and seizure, and was properly admitted at trial.

Defendant's additional contentions were fully addressed by the Court of Appeal when the case was before that court. With one exception, we agree with the Court of Appeal's resolution of the issues there presented, and we therefore reject the contentions as without merit.

[17]For a detailed explanation of the reasons why a traditional "waiver" analysis is inappropriate in determining the voluntariness of a consent to search, see *Schneckloth* v. *Bustamonte* (1973) *supra,* 412 U.S. 218, 235-246 [36 L.Ed.2d 854, 867-874].

[18]That record is further preserved, of course, when the person whose permission is sought thereafter signs a consent form which reiterates the warning in writing. This has been the practice of the FBI for many years (see Note (1974) 12 Am.Crim.L.Rev. 231, 245, fn. 74), and we are advised that a number of metropolitan police departments in California are also using such forms on occasion.

■ Defendant's final point is that the judgment sentencing him to prison on each of the four counts on which he was convicted violates the statutory prohibition against multiple punishment.[19] He first claims he cannot be separately punished for each of the three burglaries because he committed them all within the confines of the same building. He points out that burglary is a crime against property, and quotes our general rule that when "the offenses arising out of the same transaction are not crimes of violence but involve crimes against property interests of several persons, this court has recognized that only single punishment is permissible." (*People* v. *Bauer* (1969) 1 Cal.3d 368, 378 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398].) More particularly, he relies on our ensuing dictum in that opinion (*ibid.*) to the effect that a thief who enters a house and steals articles belonging to different members of the same family can be punished for only one burglary.

We adhere to that view, but we decline to extend it to the facts of the case at bar. Here defendant forcibly broke into three different rented premises occupied by tenants who had no common interest other than the fortuitous circumstance that they happened to lease office suites in the same commercial building. There is no doubt that if the premises had been located in three separate buildings defendant could have been punished for three separate burglaries; he is not entitled to two exempt burglaries merely because his victims chose the same landlord. If the rule were otherwise, a thief who broke into and ransacked every store in a shopping center under one roof, or every apartment in an apartment building, or every room or suite in a hotel,[20] could claim immunity for all but one of the burglaries thus perpetrated. Nothing in the statute or case law on multiple punishment compels such an incongruous result.

■ A closer question is presented by defendant's contention that he cannot be separately punished for his burglary of Congressman Hawkins' office (count I) and his robbery of Mrs. Kirk inside that office (count IV). Section 654 bars multiple punishment for an indivisible course of conduct which violates more than one statute, and divisibility depends in turn on the defendant's intent: if all his offenses were "incident to one objective," the defendant may be punished only once. (*People* v. *Bauer* (1969) *supra,* 1 Cal.3d 368, 376, and cases cited.) From

---

[19]Penal Code section 654 provides in relevant part: "An act or omission which is made punishable in different ways by different provisions of this Code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

[20]A person who enters any "room, apartment, [or] . . . shop" with appropriate intent is guilty of burglary. (Pen. Code, § 459.)

the facts in the present record we conclude that defendant pursued Mrs. Kirk into Congressman Hawkins' office for the purpose of terrorizing her into silence and robbing her.[21] His entry into Congressman Hawkins' office with felonious intent thus constituted a burglary which was merely an "incident to and a means of perpetrating" the intended robbery. (*People* v. *McFarland* (1962) 58 Cal.2d 748, 762 [26 Cal.Rptr. 473, 376 P.2d 449].) It is settled that in such circumstances the defendant cannot be punished for both offenses. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 639-640 [105 Cal.Rptr. 681, 504 P.2d 905] (robbery and kidnaping for purpose of robbery); *In re McGrew* (1967) 66 Cal.2d 685, 688 [58 Cal.Rptr. 561, 427 P.2d 161] (burglary and sex offenses); *In re Henry* (1966) 65 Cal.2d 330, 331 [54 Cal.Rptr. 633, 420 P.2d 97] (attempted armed robbery and assault with deadly weapon); *In re Romano* (1966) 64 Cal.2d 826, 828 [51 Cal.Rptr. 910, 415 P.2d 798] (burglary and grand theft).)

Execution of sentence on count I is stayed pending service of sentence on count IV, and thereafter permanently. (See *People* v. *Beamon* (1973) *supra*, 8 Cal.3d 625, 640.)

As so modified the judgment is affirmed.

Tobriner, Acting C. J., Clark, J., Richardson, J., Sullivan, J.,* and Wright, J.,† concurred.

---

[21]For example, we note that defendant took nothing from that office, in contrast to his thefts from the other premises in the same building.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.