## Richmond

### NORMAN WAYNE ADDISON

### V.

### COMMONWEALTH OF VIRGINIA

January 21, 1983.

Record No. 811198.

Present: All the Justices.

714

*Paul J. Neal, Jr.,* for appellant.

*Brian L. Buniva, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This appeal presents the question whether a confession, given in a sheriff's office at a time when no probable cause existed to arrest the defendant, was voluntary.

Norman Addison was convicted, pursuant to Code § 18.2-80, of aiding and abetting the arson of an unoccupied building. At his non-jury trial, after offering proof of the *corpus delicti,* the Commonwealth relied on several statements made by the defendant to the sheriff and his deputies as proof of the defendant's participation in the crime. The defendant moved to suppress these statements on the ground that, notwithstanding his receipt of *Miranda* warnings and his election to discuss the case without the assistance of counsel, he gave them in coercive circumstances, while he was subjected to a custodial interrogation, and at a time when no probable cause existed to arrest him. The trial court found that the defendant was at the sheriff's office voluntarily and that the statements were untainted by coercion. The defendant appeals this ruling.

We review the evidence, as we must, in the light most favorable to the Commonwealth. In the fall of 1980, Culpeper County had been plagued by a series of incendiary fires destroying unoccupied buildings. The suspicions of the local authorities had begun to focus on David Addison, the defendant's brother, and David's girlfriend, Susan Dodson. On the night of October 29-30, 1980, almost all the available personnel of the sheriff's office were on duty, maintaining routine patrol in the area where the fires had been occurring. Deputy Andy Hitt was maintaining surveillance of the vicinity where David Addison lived, from the intersection of Routes 522 and 650. A State Trooper discovered an abandoned house afire at the western end of the county about 11:30 p.m. and reported this information, through his dispatcher, to the sheriff's department.

A few minutes after midnight, a Ford Falcon sedan passed Deputy Hitt, southbound on Rt. 522 toward Culpeper. The deputy could not see the driver and did not recognize the car, but he turned on his flashing red lights and pursued it because it had no light on its rear license plate. He reported this fact by radio to the sheriff, who instructed him to the stop the Falcon. After he had followed it for nearly two miles, the Falcon turned into the driveway of the home of Charles L. Addison, the defendant's uncle. Hitt inquired of the dispatcher by radio and was informed that the Falcon was registered to Charles Addison. It was being driven by the defendant. The defendant got out of the Falcon and walked

over to Hitt, who opened the door but remained seated in his cruiser while writing out a summons charging the defendant with "improper equipment."[1]

Sheriff Peters, who was some distance away, heard the radio transmissions tracing the registration of the Falcon to someone named Addison. He remembered seeing such a Falcon parked in the driveway of the home of David Addison, the primary arson suspect, earlier that evening. He decided to investigate further. He arrived at Charles Addison's home about fifteen minutes after Hitt had stopped the defendant there. Two or three other sheriff's cars arrived on the scene. Their emergency lights were not operating, but the occupants were in uniform and were armed. No weapons were displayed.

The defendant's aunt appeared in front of the house, and she and the defendant "hollered" back and forth. The defendant turned away from Hitt and appeared to be starting toward the house. Hitt testified: ". . . I told Mr. Addison when he started to walk toward the house, I told him that technically he was under arrest for these two summonses until I finished with him with this . . . if . . . that he walked away from me that I'd have to charge him with resist[sic]." Hitt explained that this took place before the defendant signed the summons. When Hitt had completed the summons, he gave it to the defendant, who signed it.[2]

The defendant's aunt came out to the cars and gave the sheriff permission to take the Falcon to the sheriff's office in Culpeper and search it there. The sheriff told the defendant that he "wanted to talk to him about the fire." He asked the defendant if he would agree to go to his office in Culpeper to talk about it. The defendant said yes, and got into the back seat of the sheriff's car. The sheriff testified that he did not consider the defendant to be under arrest because "I had no grounds to stop him at that time." The usual practice of the department in making a night arrest was at least to pat the subject down for weapons. In this case, however, the defendant was not frisked, searched, handcuffed, or physically touched by any of the officers. He was not ordered into

---

[1] Because the defendant could not produce a valid registration card at the time, a charge of "no registration" was added.

[2] The summons is not in evidence. Its effect, of course, was to command the accused to appear in court at the time and place specified. Rule 3A:4(c)2. By signing it, the accused gave his written promise to appear at that time and place. The giving of such a promise by the accused requires that the officer "forthwith release him from custody." Code § 19.2-74A.1.

the car or told that he was required to go with them. The sheriff testified that if the defendant had refused to go with him, he could have gone home.

When the sheriff and the defendant arrived at the office in Culpeper, about eight miles from the Charles Addison house, the defendant was offered coffee, which he declined, and was given the usual *Miranda* warnings. He was never told that he was free to leave, but never asked about it. Defense counsel asked the sheriff:

Q. And once you got to the Sheriff's Department, would he have then also been free to go?
A. If he had said, I'm going home, he could have walked out.
Q. And you wouldn't have done anything?
A. No, sir. I[t] wouldn't have pleased me, I'll say that. But no, I think that I would have just let him go at that time.

The sheriff called deputy William Partlow, an investigator who knew the defendant. Partlow had had a·previous conversation with him at the scene of one of the earlier fires. Partlow arrived about 2:00 a.m., gave additional *Miranda* warnings to the defendant, and interviewed him for an additional two hours, off and on. During this time the defendant gave him the three statements under attack. Partlow also testified that the defendant never asked to leave, was never told either that he was or was not free to leave, but, in fact, would have been permitted to depart at any time if he had indicated a desire to do so. He was in an interview room with Partlow most of the time, but was occasionally unattended. Near the end of the interview, he expressed a wish to go to the bathroom. Partlow waited outside the door while he was there and then followed him back to the interview room. This occurred, however, after the defendant had given a statement admitting his participation in the crime, when probable cause existed to arrest him.

Partlow testified that the defendant showed no reluctance to discuss the case with him, but rather that he wanted to do so in an effort to get some kind of help for his brother, David Addison. The defendant said that he thought David had experienced some psychological problems in the military service, that David's job had been "secretive" and that he wasn't sure what his difficulties had been, but that "he was concerned for him and that he was doing this as a way to get David help." The defendant's statement made it clear that he knew David had been setting the fires since

July. He said that "David has said these fires are really bothering him, especially the barn where the Baldwin boys lost their equipment." David promised him on the night of October 29, he said, that "this was going to be the last fire."

The defendant argues that this case is controlled by *Dunaway* v. *New York,* 442 U.S. 200 (1979). There, a Rochester detective, having a "lead" casting suspicion on Dunaway for a robbery-murder, ordered two detectives to "pick him up" and "bring him in." The "lead" fell far short of the probable cause requisite for an arrest. Dunaway was taken into custody, placed in an interrogation room in the police station, and given *Miranda* warnings. He was questioned about an hour and during this time made self-incriminating statements. He was never told that he was under arrest, but he was in fact detained. The trial court found as a fact that Dunaway would have been physically restrained if he had attempted to leave. The Supreme Court held, following the rule in *Brown* v. *Illinois,* 422 U.S. 590 (1975), that detention for custodial interrogation offends the Fourth and Fourteenth Amendments unless supported by probable cause. The Court further held, following *Brown,* that while *Miranda* warnings and waivers would establish the "voluntariness" of the confession for Fifth Amendment purposes (and, presumably, would also satisfy the Sixth Amendment guarantee of the right to counsel), it would not "attenuate the taint" of an unconstitutional seizure of the person in violation of the Fourth Amendment. Thus the exclusionary rule was applied to Dunaway's confession.

This case is distinguished from *Dunaway* by the trial court's finding of fact, supported by credible evidence, that the defendant, prior to giving the statements which established probable cause, was never seized or detained against his will. The trial court correctly applied the rule of *Witt* v. *Commonwealth,* 215 Va. 670, 212 S.E.2d 293 (1975), where we held that the resolution of factual questions underlying the admissibility of confessions is in the province of the trial judge, is to be determined by the preponderance of the evidence, and is to be accorded the same weight on appeal as a finding of fact by a jury. *Id.* at 674, 212 S.E.2d at 296-97. Here, as in *Witt,* the trial court conducted a full pre-trial hearing on the defendant's motion to suppress his statements, and gave counsel wide latitude in examining the witnesses. The trial court was in a unique position to resolve the conflicts in their testimony.

The defendant, however, says that the evidence supporting the trial court's finding of voluntariness was incredible. He invites our attention to *United States* v. *Mendenhall,* 446 U.S. 544, *reh'g denied,* 448 U.S. 908 (1980), in which a part of the opinion in which only two justices joined, stated: "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. In *Gomez* v. *Turner,* 672 F.2d 134 (D.C. Cir. 1982), the court declined to follow the above-quoted *dictum* in *Mendenhall,* holding that "in this circuit the test of whether a seizure has occurred is whether a reasonable person, *innocent of any crime,* would have felt free to walk away under the circumstances." *Gomez* at 141. [Emphasis added].

The defendant argues that the totality of the circumstances surrounding his conversation with Partlow was coercive. He stresses the fact that he was never expressly told that he was free to leave. But this is no more controlling than the unarticulated state of mind of the officers. *See Comm.* v. *E. A. Clore Sons,* 222 Va. 543, 281 S.E.2d 901 (1981). The issue on appeal is simply whether there was credible evidence to support the trial court's finding that the defendant voluntarily accompanied the sheriff and was not detained against his will. On this point we need look no further than his expressed desire to talk to the authorities to seek help for his troubled brother.

The defendant also assigns error to the trial court's refusal to strike the evidence of an expert who testified that the value of the burned building, before the fire, would have exceeded $100, which was then the minimum threshold for a felony conviction under Code § 18.2-80. The defendant conceded the qualifications of the witness, but contends that his reasoning was faulty and that he had no experience in this kind of appraisal. This argument lacks merit. The validity of the reasoning process by which an expert reaches his opinion is within the province of the trier of fact, and goes only to the weight to be accorded to his opinion. *See Ford* v. *Ford,* 200 Va. 674, 107 S.E.2d 397 (1959). The trial court, for reasons articulated in the record, found it worthy of credit.

For the foregoing reasons, the judgment will be

*Affirmed.*