**Richmond**

WALTER FREDERICK MAY

v.

COMMONWEALTH OF VIRGINIA

No. 0211-85

Decided October 21, 1986

COUNSEL

Kenneth L. Dickinson (Bode & Dickinson, on brief), for appellant.

Thomas C. Daniel, Assistant Attorney General (William G. Broaddus, Attorney General, on brief), for appellee.

OPINION

**MOON, J.** — Walter Frederick May seeks reversal of his conviction in the Circuit Court for the City of Richmond for possession of marijuana with the intent to distribute. He contends: (1) that the evidence obtained from the car he was driving at the time of his arrest was the product of an unlawful search and seizure; (2) that a statement he made pertaining to ownership of the luggage was improperly admitted into evidence; (3) that the Commonwealth failed to prove that his consent to search was freely and voluntarily given; and (4) that the Commonwealth failed to prove that he knowingly and consciously possessed the luggage with knowledge of its contents. We disagree and affirm the conviction.

In considering the evidence on appeal, we view it in the light most favorable to the Commonwealth since it prevailed at the trial level; the judgment of the trial court will not be reversed if the decision was based upon credible evidence. *Sutphin v. Commonwealth*, 1 Va. App. 241, 243, 337 S.E.2d 897, 898 (1985). May was first observed while driving on Interstate 95 through the City of Richmond at an excessive speed. Trooper Harold W. English, Jr. stopped May to issue a speeding ticket. In the process of and before stopping the car, English realized that it fit what was known in drug law enforcement circles as "a drug courier profile vehicle"; the characteristics of the automobile were consistent with the characteristics of other automobiles known to have transported drugs from Florida. English noted that the automobile had a license plate issued only to Florida rental vehicles. He also ob-

served that the car appeared heavily weighted in the rear. At the time the automobile was stopped, however, the fact that it fit a drug courier profile was irrelevant. The automobile was lawfully stopped for a traffic violation and the defendant does not contest the validity of the initial detention.

After he stopped the car, English observed that the circumstances were even more consistent with the drug courier profile. English first checked to see if the car was stolen and learned that it was not. He learned that the automobile had been rented at the International Airport National Rental Car Association in Miami by a person named Robin Elaine Willis, who was not in the car. Based upon his training, English knew that drug couriers frequently used rental cars from Miami to transport drugs. He also noticed that May, the driver, spoke with an accent. Although another individual named Palmer was in the car, there were just a few clothes in the passenger compartment, also an additional characteristic of those known to be transporting drugs.

May and Officer English were in Officer English's vehicle while English was writing the traffic citation. He asked May if he could search the car and May verbally consented. While May was still in English's vehicle, and after May's verbal consent to the search, Trooper J. W. Lucas, who had been summoned by English, arrived on the scene at 11:18 a.m., fifteen to twenty minutes after English stopped May's car. Aware of May's verbal consent to search the car, Officer Lucas got in the back seat of English's vehicle and handed a search consent form to May, who was seated in the right front seat. He explained the contents of the form to May. May acknowledged to Lucas that he could read and write. He took the form, sat there for approximately five minutes, and then signed it. After May signed the form, Lucas obtained the keys to the rental car. May and Palmer got out of the car and stood behind it, along with Trooper English, while Trooper Lucas unlocked the trunk. Upon seeing several pieces of luggage, Trooper Lucas asked May and Palmer: "Whose luggage is this?" May instantaneously replied: "Mine." When the bags were opened, they were found to contain green plant material later determined to be 115 pounds of marijuana. At that point, the officers arrested May and Palmer and read the *Miranda* warnings to them.

At trial, May disputed the troopers' version of what took place. May denied admitting the bags were his when asked who owned them. He testified that, in fact, the officers never asked who owned the bags. He admitted that he understood all of the questions Officer English asked him before the trunk of the car was opened but asserted that he did not understand any questions that were asked thereafter.

## I.

May first contends that the marijuana found in the trunk of the car, and his admission that he owned the luggage containing the marijuana, were improperly admitted into evidence because he had not yet been given the *Miranda* warnings by either officer before the drugs were found in the luggage. The validity of the search of the trunk depends upon a finding of a valid consent to search. May argues that a suspect in custody cannot give a valid consent to search prior to receiving his *Miranda* warnings. Since we find that he was not "in custody" at the time consent was given (and, thus, that he was not entitled to the *Miranda* warnings) we do not address the issue whether the failure to give *Miranda* warnings to one in custody would taint a consent to search that was otherwise freely and voluntarily given. *Compare People v. Thomas*, 12 Cal. App. 3d 1102, 91 Cal. Rptr. 867 (1970) *with State v. Williams*, 248 Or. 85, 432 P.2d 679 (1967).

May also contends that the consent to search was not freely and voluntarily given. This issue is discussed *infra*.

The Supreme Court stated in *Miranda v. Arizona*, 384 U.S. 436 (1966) that police officers must inform a defendant of his constitutional rights before a "custodial interrogation" begins. It defined a custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. In applying this standard to questions asked by police officers at the scene of a routine traffic stop, the Court stated in *Berkemer v. McCarty*, 468 U.S. 420 (1984) that the intimidating circumstances surrounding a custodial interrogation, such as one at a police headquarters, do not usually exist when a vehicle is stopped on a public highway. The Court pointed out that questions at the scene of the stop usually

involve only one or two police officers and are generally conducted in public, lessening the likelihood of police intimidation or abuse. *Berkemer*, 468 U.S. at 438. Just because a person is detained at a traffic stop does not place that person "in custody" for purposes of *Miranda*. *Id*. at 440.

In this case, there were only two police officers at the scene. The questioning took place on a busy public highway in view of passing motorists, and May's passenger, Palmer, was present at all times. These facts do not support a finding that May was "in custody" for purposes of the *Miranda* decision as defined by the Supreme Court in *Berkemer*.

As the Supreme Court stated in *Berkemer*:

> [T]he usual traffic stop is more analogous to a so-called "*Terry* stop," . . . [*see Terry v. Ohio*, 392 U.S. 1 (1968)] than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." [*United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)]. . . . "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" [*Id*. (quoting *Terry v. Ohio*, 392 U.S. at 29)]. . . . Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. *The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda.* The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer*, 468 U.S. at 439-40 (emphasis added).

Trooper English was initially justified in stopping May because May was speeding. Since the vehicle was rented by an individual not in the car when stopped, it was reasonable for English to determine whether May had stolen the car. While writing the traffic citations, English asked May if he could search the car. May verbally agreed to the search without asking why English wanted to conduct the search and before Trooper Lucas had arrived. At that point, Lucas arrived on the scene and explained the consent to search form to May, who signed it. Until May verbally consented to the search of the car, his detention by English was reasonable because of the circumstances involved with writing May a ticket for his speeding violation. After May consented to the search, any further detention was implicitly consensual on his part.

Also, the questions the troopers asked May (concerning whether the car was stolen, if drugs were in the car, and whose luggage was in the trunk) did not turn the roadside investigation into the equivalent of a "custodial" interrogation merely because they concerned the transportation of drugs. *See Florida v. Royer*, 460 U.S. 491, 498-99 (1983). As discussed *infra*, it is not the seriousness of the offense being investigated that determines whether a suspect should be afforded the *Miranda* rights.

May also contends that because he was both in a traffic detention and a "*Terry* stop" logic dictates that his detention was "custodial" for *Miranda* purposes. However, we must reject this argument because the nature of the detention in this case was no more "compelling" than that in *Berkemer*.

■ Even if we disregard the fact that May consented to the search, he has failed to demonstrate that, following the traffic stop, he "thereafter . . . [was] subject to treatment that . . . [rendered] him 'in custody.' " *Berkemer*, 468 U.S. at 440; *see also Addison v. Commonwealth*, 224 Va. 713, 719, 299 S.E.2d 521, 524 (1983). Furthermore, the reasons for the *Miranda* rule did not come into play at any time:

> The purposes of the safeguards prescribed by *Miranda* are to *ensure* that the police do not coerce or trick captive suspects into confessing, to relieve the " 'inherently compelling pressures' " generated by the custodial setting itself, " 'which work to undermine the individual's will to resist,' " and as much as possible to free courts from the task of scrutinizing

individual cases to try to determine, after the fact, whether particular confessions were voluntary. Those purposes are implicated as much by in-custody questioning of persons suspected of misdemeanors as they are by questioning of persons suspected of felonies.

*Berkemer*, 468 U.S. at 433 (citations omitted).

Thus, the Supreme Court rejected the notion that misdemeanor suspects in custody were not to be afforded their *Miranda* rights while felony suspects were. It rejected this easy to apply "bright-line" test because it was the custodial setting itself that tended to be coercive, not the seriousness of the charge. Police officers also may not know if the defendant has committed a felony or misdemeanor until further investigation. For the same reasons, we think that *Miranda* should not be applied to the facts of this case. The questioning by the officers was not proven to be any more coercive simply because they were investigating potentially serious matters beyond the traffic offense.

Therefore, the marijuana and May's statement that he owned the luggage were properly admitted into evidence.

## II.

May also contends that he did not freely and voluntarily consent to the search. He testified that he verbally consented to the search only after Trooper English informed him that if he did not consent, English could bring drug detecting dogs to the scene. May also stated that he thought Lucas told him that the consent to search form was actually a search warrant, and that he did not read it because he could not read or write very well, having only a sixth grade education. He also testified that he signed the consent form merely to be cooperative with the police. May's statements were contradicted by the police.

We, as an appellate court, must "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Parks v. Commonwealth*, 221 Va. 492, 498, 270 S.E.2d 755, 759 (1980) (quoting *Wright v. Commonwealth*, 196 Va. 132, 137, 82 S.E.2d 603, 606 (1954)). "Additionally, the credibility of witnesses and the weight

to be given their testimony are questions exclusively within the province" of the fact finder. *Barker v. Commonwealth*, 230 Va. 370, 373, 337 S.E.2d 729, 732 (1985). There is ample credible evidence to support the trial court's finding that May freely and voluntarily consented to the search.

### III.

■ May finally argues that the evidence does not support a finding that he knowingly and consciously possessed the marijuana. There is no merit to this contention. Constructive possession of drugs may be established by a showing that the defendant had dominion or control over the drugs. *Andrews v. Commonwealth*, 216 Va. 179, 182, 217 S.E.2d 812, 814 (1975) (citing *Gillis v. Commonwealth*, 215 Va. 298, 301-02, 208 S.E.2d 768, 771 (1974); *Ritter v. Commonwealth*, 210 Va. 732, 741, 173 S.E.2d 799, 805-06 (1970)). When asked who owned the luggage that contained the marijuana, May told the police it was his. He also was in possession of the keys to the trunk in which the marijuana was found. The only other person in the vehicle with him was neither the owner nor the lessee of the vehicle. Thus, May had complete dominion and control over the marijuana found in the cases.

The conviction, therefore, is affirmed.

*Affirmed.*

Cole, J., concurred.

Benton, J., dissenting.

I believe that Walter May's statement pertaining to ownership of the luggage was improperly admitted into evidence. In *Miranda v. Arizona*, 384 U.S. 436 (1966) the Supreme Court stated:

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self- incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*

*Id.* at 444 (emphasis added).

Within the context of a traffic stop the Supreme Court has also concluded:

> If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*
>
> * * *
>
> [T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

*Berkemer v. McCarty,* 468 U.S. 420, 440, 442 (1984) (citation omitted).

I believe that the majority opinion's conclusion that the evidence merely shows a traffic stop which proceeded into a *Terry*-style detention overlooks the significant way in which May's freedom of action was curtailed by law enforcement officers.

This was not, even at its inception, a routine traffic stop for a speeding violation. The record shows that Trooper English first saw the vehicle being driven by Walter May as it "left the Chippenham toll booth area, exit seven." After following the vehicle and prior to stopping the vehicle, Trooper English determined that it was "what is known as a profile vehicle" because the vehicle had Florida rental license plates and was riding low in the rear. He stopped the vehicle for a speeding violation approximately four miles north of exit seven at a point one and one-half miles south of exit nine. May was directed to exit the vehicle and sit on the front seat of Trooper English's vehicle. May's passenger, Palmer, remained behind in May's vehicle. Trooper English entered his vehicle and proceeded to question May for approximately one-half hour. He determined from May that the vehicle was rented in Miami to Robin Willis and that May had a valid operator's license. English asked May whether the car was stolen and confirmed through a radio check that the car had not been stolen. Trooper English further questioned May as to whether he was carrying illegal contraband or drugs. He also asked May if he could search the vehicle. May testified that he asked Trooper English why he wanted to search the vehicle and Trooper English responded that he would send for the dogs if May would not consent

to the search. Trooper English testified that May verbally agreed to a search of the vehicle and that to the best of his knowledge May did not ask why he wanted to search the vehicle.

Twenty-eight to thirty-three minutes after the stop, and as Trooper English was still writing the traffic citation, Trooper Lucas, who had received a call from Trooper English, came to the scene and sat on the rear seat of Trooper English's vehicle. Trooper Lucas identified himself and gave May a consent to search form. May sat for five minutes with the form and then signed it.

As one of the troopers retrieved the key from the ignition of May's car, the other trooper watched May and Palmer at the highway guardrail near the trunk. May testified that Trooper English opened the luggage in the trunk and that Trooper English warned May and Palmer not to "try anything because it's easy to get nervous." May denied being asked who owned the luggage. On the other hand, Trooper English testified that he watched May and Palmer as Trooper Lucas opened the trunk and asked, "whose luggage?" Trooper English testified that he heard May reply, "mine". The luggage was opened and found to contain a total of 115 pounds of marijuana. May and Palmer were arrested and then given *Miranda* warnings.

I believe that the statement "mine" should have been suppressed because May had not been given the *Miranda* warnings. The evidence compels a conclusion that May was "subjected to treatment that rendered him 'in custody' for practical purposes" when he was stopped for a speeding violation, removed to the confines of Trooper English's vehicle and interrogated, and that the circumstances of the detention "sufficiently impair[ed] his free exercise of his privilege against self-incrimination." *Berkemer v. McCarty*, 468 U.S. at 437.

*Berkemer*, while holding that *Miranda* warnings need not be given in all traffic stops, does not hold that *Miranda* warnings are never required in traffic stops, and also does not hold that a suspect is only entitled to *Miranda* warnings after he is arrested. *Id.* at 440. The Court did state, however, that there will arise on occasion the difficult question whether custodial interrogation has occurred during a traffic stop situation and that the police and the courts will be required to resolve the question on a case-by-case

analysis. *See id.* at 441; *see also United States v. Gibson*, 392 F.2d 373, 376 (4th Cir. 1968); *State v. Herem*, 371 N.W.2d 40, 42 (Minn.App. 1985). Thus, not all roadside questioning by police will lead to the admissibility of statements, as the majority apparently concludes it will, on the ground that "traffic stop" questioning does not require *Miranda* warnings. Furthermore, custodial interrogation may occur although there has been no formal arrest. *See People v. Austin*, 128 Misc. 2d 923, 925, 491 N.Y.S.2d 982, 984 (1985); *Commonwealth v. Meyer*, 488 Pa. 297, 306, 412 A.2d 517, 521 (1980). The *Miranda* phrase, "otherwise deprived of his freedom of action in a significant way," suggests a deprivation of freedom more stringent than the ordinary stop of a vehicle, *see Berkemer*, 468 U.S. at 435-40, but is not limited to formal arrest. *See Miranda*, 384 U.S. at 444.

May was stopped both for a speeding violation and because Trooper English suspected that he was a drug carrier. Although he was not initially informed by Trooper English that he was under suspicion because he met "a drug profile," he was informed of the speeding violation and placed in the trooper's vehicle. He was not told that he was free to leave; moreover, he was in fact not free to leave because he was being charged for a speeding violation. No reasonable person in May's position would believe that he was free to leave or to disobey the directive to get into the trooper's vehicle. He was required to cooperate while the trooper prepared a traffic citation for speeding. Although he was not told that he was under arrest, his detention at that point was functionally equivalent to a formal arrest. *See Herem*, 371 N.W.2d at 43. It is reasonable to assume that had he attempted to leave he would have been formally arrested. I believe that a motorist, in circumstances such as here, who is charged by a trooper with exceeding the speed limit, placed in the confines of the trooper's vehicle for the purpose of being charged, and interrogated regarding matters unrelated to the traffic violation prior to the issuance of the citation, has had his "freedom of . . . action curtailed to a 'degree associated with formal arrest.'" *Berkemer*, 468 U.S. at 440; *see also Meyer*, 488 Pa. at 305-06, 412 A.2d at 520-21.

Having removed May to his vehicle and away from the public's view, Trooper English for a period of twenty-eight to thirty-three minutes proceeded to test his suspicion that May was a criminal agent. Furthermore, when Trooper Lucas arrived May was not

lingering in the trooper's vehicle because of his own free will. Trooper English was *still* completing the traffic citation. This was not merely a brief, noncoercive, roadside stop conducted in the public view. Here the questioning within the confines of the trooper's vehicle was not different than stationhouse interrogation. *See United States v. Schultz*, 442 F.Supp. 176, 181 (D. Md. 1977). It was prolonged, it was unrelated to the traffic violation, and it was coercive. May certainly was aware that he could not leave until the questioning ceased, the citation, which had not been written, was given to him, and the trooper released him.

Although the trial court was entitled to disregard May's testimony that Trooper English threatened to "call for the dogs" if May did not consent, I believe it is significant that Trooper English, who was present in the courtroom when May testified regarding that fact, did not rebut that testimony when he testified subsequent to May. In substantial part May's testimony was consistent with Trooper's English's testimony; furthermore, the trial court's only comment as to the credibility of the witnesses relates to the identification of the luggage:

THE COURT: The Court believes from the evidence what happened was the trunk was raised. The trooper saw the suitcase and asked whose it is. The defendant indeed indicated it was his. So, the Court *rejects that much of his testimony today that conflicts with the trooper's as to that portion.*

Unlike *Berkemer*, where the trooper "decided as soon as the motorist stepped out of his car that [the motorist] would be charged with a traffic offense" but "never communicated his intentions to [the motorist]," Trooper English not only communicated his intent to charge May with a traffic offense, but he removed him from the relative freedom of his own vehicle and the public way into Trooper English's vehicle. Furthermore, at least forty-five minutes transpired between the initial stop and the search of the trunk. While the trunk was being opened both May and his passenger were directed to stand by the guardrail at the rear of the vehicle and warned not to try anything. The circumstances of May's detention from the moment he was placed in the trooper's vehicle through the search of the trunk of May's vehicle were sufficient to constitute "custody" within the meaning of

*Miranda* and *Berkemer*. I believe that May's treatment can "fairly be characterized as the functional equivalent of a formal arrest," *Berkemer*, 468 U.S. at 442, and that the unwarned statement made by May subsequent to his detention in Trooper English's vehicle was inadmissible and should have been suppressed. For this reason, I would reverse the conviction and remand for a new trial if the Commonwealth be so advised.